16-1443-pr
Allah v. Milling

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2016

(Argued: February 28, 2017   Decided: November 22, 2017)

Docket No. 16-1443-pr

_____

ALMIGHTY SUPREME BORN ALLAH,

*Plaintiff-Appellee*,

— v. —

LYNN MILLING, Director of Population Management, GRIGGS, Counselor Supervisor, and CAHILL, Captain,

*Defendants-Appellants*,

QUIROS, Warden, POWERS, Deputy Warden, FULCHER, Deputy Warden, LAJOIE, District Administrator, and DEPUTY COMMISIONER DZURENDA,

*Defendants.*

_____

B e f o r e:

KATZMANN, *Chief Judge*, POOLER and LYNCH, *Circuit Judges.*

_____

Defendants-appellants Lynn Milling, Brian Griggs and Jason Cahill ("Defendants") appeal from a judgment entered in favor of plaintiff-appellee Almighty Supreme Born Allah ("Allah") by the United States District Court for the District of Connecticut (William I. Garfinkel, *Magistrate Judge*). Following a two-day bench trial, the district court ruled that Allah's due process rights were violated when prison officials assigned Allah, who was then a pretrial detainee, to Administrative Segregation in October 2010. The district court also rejected Defendants' claim that they were entitled to qualified immunity. For the reasons that follow, we agree with the district court that Allah's substantive due process rights were violated, but we conclude that Defendants were entitled to qualified immunity. Accordingly, we REVERSE the judgment of the district court, and direct the entry of a judgment in favor of Defendants.

Judge POOLER concurs in part and dissents in part in a separate opinion.

--------

JOHN J. MORGAN, Barr & Morgan, Stamford, CT, *for* Plaintiff-Appellee.

STEVEN M. BARRY, Assistant Attorney General, for George Jepsen, Attorney General for the State of Connecticut, Hartford, CT, *for* Defendants-Appellants.

--------

GERARD E. LYNCH, *Circuit Judge*:

Defendants-appellants Lynn Milling, Brian Griggs and Jason Cahill (collectively, "Defendants") appeal from a judgment entered in favor of plaintiff-appellee Almighty Supreme Born Allah ("Allah") in the United States District Court for the District of Connecticut (William I. Garfinkel, *Magistrate Judge*).

Following a two-day bench trial, the district court ruled that Allah's due process rights were violated when prison officials assigned Allah, who was then a pretrial detainee, to Administrative Segregation in October 2010. The district court also rejected Defendants' claim that they were entitled to qualified immunity. For the reasons that follow, we agree with the district court that Allah's substantive due process rights were violated, but we conclude that Defendants were entitled to qualified immunity. Accordingly, we REVERSE the judgment of the district court.

## BACKGROUND

The facts as found by the district court are not in dispute, *see Almighty Supreme Born Allah v. Milling*, No. 11 Civ. 668, 2016 WL 1311997 (D. Conn. Apr. 4, 2016), and we recite only those necessary to explain our resolution of this appeal.

## I. Factual Background

### A. The Inmate Classification Process

During the relevant time period, Allah was an inmate in the custody of the State of Connecticut Department of Correction ("DOC"). Pursuant to DOC administrative directive, each inmate is assigned to a DOC facility through a "classification process," *id.* at *1, the goal of which is to place inmates in a facility

3

appropriate for their individual needs while accounting for the security risk they pose. As part of the classification process, inmates are assigned an "overall risk score" of one (low risk) to five (high risk), *id.*, calculated on the basis of certain risk factors, including the severity or violence of the inmate's current offense, any history of escape or violence, and the inmate's disciplinary history.

An inmate's overall risk score can determine whether he or she is placed in Administrative Detention or Administrative Segregation, which are, as described in more detail below, "restrictive housing status[es]" in DOC facilities that "provide[] for closely regulated [inmate] management" and physical separation from the general prison population. A. 82. Pursuant to DOC administrative directive, inmates who receive an overall risk score of five are placed in Administrative Segregation. In addition, and central to this case, if an inmate re-enters DOC custody after having been released from a prior term of incarceration with an overall risk score of five, the inmate is automatically placed in Administrative Detention upon re-entry pursuant to DOC administrative directive, pending a determination within 15 days of whether Administrative Segregation should be continued. If a continuance is recommended, a "classification hearing" must be held within 30 days, at which a hearing officer is

4

required to "examin[e] evidence to support the classification, including statements by the inmate and/or any witnesses." *Allah*, 2016 WL 1311997, at *4 (internal quotation marks omitted). The hearing officer then makes a written recommendation to the Director of Offender Classification and Population Management, who decides whether the inmate is to be placed in Administrative Segregation.

DOC administrative directives leave discretion to prison officials to discontinue Administrative Segregation for inmates who re-enter DOC custody after being released from a prior term of incarceration with an overall risk score of five. But the district court found, on the basis of Defendants' testimony at trial, that placement in Administrative Segregation "will continue" for such inmates except in specific circumstances: where the inmate was close to completing all three phases of the Administrative Segregation program or had been released from DOC custody more than five years before re-entry. *Id.* at *5. In such cases, the inmate "might not be continued in Administrative Segregation." *Id.*

**B.    Allah's Previous Incarceration and Assignment to Administrative Segregation**

In December 2009, after being sentenced to 27 months' imprisonment for

5

violating probation, Allah was in DOC custody as a post-conviction prisoner with an overall risk score of three and was incarcerated at Carl Robinson Correctional Institution, a medium-security "open campus dormitory-style facility." *Id.* at *4. On December 22, 2009, Allah and approximately fifty other inmates were standing near a control station waiting for a commissary visit when they were told that the visit would be delayed. Allah asked the correctional officer in the control station if he could speak to a lieutenant about the delay – a request that was apparently perceived, in the context of a facility with a history of riots, as an attempt to incite other inmates to protest the delay. In response, a lieutenant was called to the scene with prison staff and dogs, and Allah later received a disciplinary report charging him with "Impeding Order," *id.*, to which he pled guilty. Thereafter, following a hearing, Allah's overall risk score was increased to five, and on February 11, 2010, he was placed in Administrative Segregation, where he remained until his release from DOC custody on March 25, 2010.

Allah does not challenge his placement in Administrative Segregation, as a post-conviction prisoner, on that occasion.

### C. Allah's Subsequent Arrest and Return to Administrative Segregation

6

Following his release, Allah was arrested on new drug-related offenses and returned to DOC custody as a pre-trial detainee on September 13, 2010. Consistent with the classification procedures described above, Allah was placed in Administrative Detention upon re-entry and transferred to Northern Correctional Institution ("Northern"), a maximum-security facility, pending a classification hearing to determine whether he should be reassigned to Administrative Segregation. On September 23, 2010, Allah received written notice of the hearing, which stated in relevant part as follows: "According to the DOC Classification Manual, any inmate who discharges while on Administrative Segregation (A/S) shall be re-admitted at that status. You were placed on A/S on 02/08/10. Since that time you discharged and returned to the DOC without completing the program." A. 109.

Plaintiff's classification hearing was held on September 30, 2010. The hearing officer, Defendant Griggs, explained to Allah that he was being considered for placement in Administrative Segregation because he had been discharged from a prior term of incarceration while on that status. Hearing records prepared by prison officials note that Allah stated at the hearing that "[he] was in Phase One," A. 106, ostensibly referring to the fact that Allah was in

7

the first of the three phases of Administrative Segregation when released from his prior term of incarceration.

On October 4, 2010, Griggs recommended that Allah be placed in Administrative Segregation, reasoning in relevant part as follows:

> Summary of placement rationale: According to the DOC Classification Manual, any inmate who discharges while on Administrative Segregation (A/S) shall be re-admitted at that status. I/M Allah was placed on A/S on 02/08/10. Since that time he discharged and returned to the DOC without completing the program. . . .
>
> Reason(s) for recommendation: Inmate Allah did not complete the program, therefore, he needs [to] continue in Administrative Segregation placement to complete program requirements prior to being placed in general population.

A. 106-07. Defendant Milling, in her capacity as Director of Offender Classification and Population Management, authorized the placement the same day, writing on the approval form, "Continue in A.S. program Phase TBD by facility." A. 107.

### D. Administrative Segregation at Northern

As a result of the classification process described above, Allah was placed in Administrative Segregation at Northern while a pretrial detainee from October

4, 2010 to September 26, 2011.[1] As noted above, Administrative Segregation is one of many restrictive housing statuses in DOC facilities that "provide[] for closely regulated [inmate] management" and physical separation from the general prison population. A. 82. Administrative Segregation, in particular, consists of a "three phase program" that is "designed to remove problematic inmates from the general population, usually based on an incident that occurred while the inmate was in the general population, for safety and security reasons." *Allah*, 2016 WL 1311997, at *2. Phase I is the most restrictive of the three phases and generally lasts for a minimum of four months. During Phase I, an inmate typically spends 23 hours a day alone in his cell, and must be put in leg irons and handcuffed behind the back whenever out of his cell. Phase I inmates are permitted to leave their cell for three 15-minute showers per week (during which they may remove their handcuffs but must wear leg irons); one 30-minute visit per week with an immediate family member (during which a physical barrier is placed between the

---

[1] On September 26, 2011, Allah became a post-conviction prisoner after pleading guilty to the charges for which he was arrested in September 2010. On November 3, 2011, having completed Phase III of the Administrative Segregation program, he was transferred to Cheshire Correctional Institute and released from Administrative Segregation, and on May 30, 2012, he was released from DOC custody. Allah does not challenge his placement in Administrative Segregation during his time as a post-conviction prisoner.

inmate and his or her visitor); one 15-minute telephone call per week (during which inmates are handcuffed in front, rather than in back, and must wear leg irons); and five 60-minute recreation sessions per week (during which handcuffs must be worn unless the inmate is in a secured, individual recreation area). Meals are eaten inside an inmate's cell, and inmates may keep a radio, five pieces of mail, and reading materials not exceeding the four cubic feet of total property allowed in their cells.

During Phases II and III, which generally last around three months each, some of those restrictions are relaxed, *see id.* at *2-*3 (describing the differences between Phases I, II and III), and inmates complete "programming" called "Thinking for a Change" that is designed to improve their anger management and coping skills, *id.* at *4. That programming is completed in a group setting, which allows inmates to gradually increase their interaction with others as they progress through Phases II and III of Administrative Segregation, thereby facilitating their return to the general prison population. Progression through the phases of Administrative Segregation is contingent on "successful completion of the prior phase." *Id.* at *2.

Allah began Phase I of Administrative Segregation on October 4, 2010 and

was alone in his cell for approximately 23 hours a day during the placement. Because inmates are not permitted to walk to the shower area naked and must wear leg irons while showering during Phase I, Allah had to shower in his underwear and walk back to his cell wearing the wet clothing. On one occasion, Allah's leg irons became caught in the rubber carpeting in the shower area, and he fell and hit his head. He was returned to his cell after being examined by medical staff.

On December 13, 2010, Allah was recommended for Phase II of Administrative Segregation but refused to sign a "progression document" setting forth the expectations of inmates in Phase II because he did not want to consent to the placement and felt that he should not be in Administrative Segregation as a pretrial detainee. *Id.* at *6. He later consented to progression to Phase II because it would allow him additional contact with his family, and on April 27, 2011, Allah progressed to Phase II. Approximately four months later, Allah progressed to Phase III and completed that phase on November 3, 2011, at which point he was transferred to Cheshire Correctional Institute and taken out of Administrative Segregation.

At trial, Allah testified that his placement in Administrative Segregation

strained his relationship with his family because it was difficult for his wife to travel to Northern and because he did not want his four-year old daughter to see him in restraints during visits. Allah also testified that while in Administrative Segregation, he "rarely slept," "lost weight," "always rested in such a way where he could 'get up immediately' if necessary to protect himself," and felt paranoid and "always . . . on guard and on edge." *Id.* at *7. Those feelings of paranoia persisted even after Allah's release from DOC custody.

**II.    Procedural History**

In April 2011, while in Phase I of Administrative Segregation, Allah brought suit against Defendants in the district court pursuant to 42 U.S.C. § 1983, asserting that prison officials violated his due process rights when they placed him in Administrative Segregation in October 2010 while a pretrial detainee. In December 2015, the district court held a two-day bench trial at which Allah and all three Defendants testified. Thereafter, the district court issued a written opinion ruling that Defendants had violated Plaintiff's due process rights and rejecting Defendants' claims that they were entitled to qualified immunity. The district court entered judgment in favor of Allah and awarded him $62,650 in compensatory damages. This timely appeal followed.

12

**DISCUSSION**

On appeal, Defendants challenge the district court's determination that Allah's due process rights were violated when he was placed in Administrative Segregation in October 2010 while a pretrial detainee. Defendants also challenge the district court's ruling that they were not entitled to qualified immunity.[2] In evaluating a due process challenge to pretrial detention, "we review the district court's findings of historical fact for clear error and its ultimate resolution of the constitutional due process issue *de novo*." *United States v. Briggs*, 697 F.3d 98, 101 (2d Cir. 2012) (internal quotation marks and alteration omitted). "[W]e review *de novo* . . . a decision affording a defendant qualified immunity [following a bench trial]." *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013).

**I.     Allah's Due Process Claim**

"[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*,

---

[2] Defense counsel suggests in passing that Defendant Cahill was not involved in the decision to place Allah in Administrative Segregation, but does not squarely argue that the district court erred in determining that Cahill had the requisite personal involvement for liability under § 1983. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Because we reverse the district court's judgment as to all Defendants on qualified immunity grounds, we do not reach the question of Cahill's personal involvement in the challenged conduct.

441 U.S. 520, 535 (1979). Thus, in assessing whether restrictions on pretrial detainees comport with substantive due process, "[a] court must decide whether the [restriction] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. Absent proof of intent to punish, "that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.'" *Id.,* quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963) (alteration in original); *see Block v. Rutherford*, 468 U.S. 576, 584 (1984). Accordingly, "if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Wolfish*, 441 U.S. at 539.[3]

---

[3] Claims under the *Wolfish* framework concern a pretrial detainee's substantive due process rights. *See Wolfish*, 441 U.S. at 532; *see also Block*, 468 U.S. at 593 (Blackmun, *J.,* concurring) (describing *Wolfish* as "announc[ing]" a "substantive due process standard"). In addition to his substantive due process claim, Allah also asserts what he characterizes as a procedural due process claim, challenging the standard used by prison officials at the September 30, 2010 classification hearing to determine whether to place Allah in Administrative Segregation. Specifically, Allah argues that prison officials erred when they asked at that hearing only whether he had been released from a prior term of incarceration while on Administrative Segregation in determining whether he should be reassigned to the placement, instead of assessing whether he

In many cases, a pretrial detainee's placement in a restrictive housing status like Administrative Segregation may be determined to be reasonably related to legitimate governmental purposes. In *Wolfish*, the Supreme Court recognized that the government has a legitimate interest in the security of prisons, and that prison officials should be afforded deference "in the adoption and execution of policies and practices . . . needed to preserve internal order and discipline and to maintain institutional security." *Wolfish*, 441 U.S. at 547. Accordingly, in prior summary orders, we have found measures similar to Administrative Segregation not to violate substantive due process where prison officials subjected pretrial detainees to such measures in response to specific evidence that those detainees posed a risk to institutional security, and where the

posed a risk to institutional security. That argument, however, sounds in substantive rather than procedural due process and is governed by the *Wolfish* framework. Procedural due process requires that a pretrial detainee be given "written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence" before being subjected to punitive as opposed to administrative measures. *Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001). On appeal, Allah does not squarely challenge the adequacy of those aspects of the classification hearing, and Allah's counsel specifically disavowed any challenge to "the procedure that was done" or "[t]he notice and stuff like that" before the district court. A. 393. Accordingly, we conclude that the district court erred in concluding that Allah's procedural due process rights were violated, and we consider Allah's assertions regarding the substantive standard employed at his classification hearing in the course of evaluating his substantive due process claim under the *Wolfish* framework.

15

measures were not excessive in relation to that purpose. *See Cabral v. Strada*, 513 F. App'x 99, 103 (2d Cir. 2013) (rejecting substantive due process claim where pretrial detainees were placed in segregated housing unit after prison officials received reports from confidential informants that, *inter alia*, a "green light" had been issued by rival gang members to physically attack the detainees on sight in the prison); *Taylor v. Comm'r of N.Y.C. Dep't of Corr.*, 317 F. App'x 80, 82 (2d Cir. 2009) (rejecting substantive due process claim where pretrial detainee was placed in segregated housing unit after being "implicated in an assault against an inmate who subsequently died").

Here, the district court found no such evidence. Prison officials did not, for example, make an "individualized or specific finding of the risk Allah may have presented in the fall of 2010," or any "real determination . . . [or] individualized assessment[] that Administrative Segregation was appropriate for Allah" during that time period. *Allah*, 2016 WL 1311997, at *9-*10. Nor did they review the particulars of the December 2009 incident that gave rise to Allah's prior placement in Administrative Segregation and make a determination that the incident justified continued placement in Administrative Segregation in October 2010, or assess Allah's disciplinary record since the December 2009 incident to

16

determine whether the placement was appropriate. Instead, the district court found that the "only reason for the placement" was the fact that Allah had previously been assigned to Administrative Segregation during his prior term of incarceration and "had not completed the program." *Id.* at *10.[4]

On those findings of fact, which Defendants do not squarely challenge and in which we find no clear error, we agree with the district court that Allah's substantive due process rights were violated when he was assigned to Administrative Segregation in October 2010 while a pretrial detainee. Although prison officials are to be afforded deference in matters of institutional security,

---

[4] Defendants' primary argument on appeal attempts to duck the district court's findings of fact. Specifically, without challenging the relevant findings of fact for clear error, Defendants assert that Allah's October 2010 placement in Administrative Segregation was based on Allah's involvement in the December 2009 incident, and thus stemmed from concerns about Allah's continuing threat to institutional security. The district court acknowledged that Griggs and Milling testified at trial that they had reviewed paperwork relating to the December 2009 incident in the course of determining that Allah should be reassigned to Administrative Segregation in October 2010, but it found, nevertheless, that the decision was based solely on the fact of Allah's prior placement in (and failure to complete) Administrative Segregation during his prior term of incarceration. *Allah*, 2016 WL 1311997, at *6, *10. We detect no clear error in that finding, which Defendants do not squarely challenge and which is well-supported by the testimony and documentary evidence introduced at trial. *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) ("In reviewing findings for clear error [following a bench trial], we are not allowed to second-guess . . . the trial court's . . . choice between permissible competing inferences." (internal quotation marks omitted; alterations in original)).

17

such deference does not relieve officials from the requirements of due process or permit them to institute restrictive measures on pretrial detainees that are not reasonably related to legitimate governmental purposes. *See Wolfish*, 441 U.S. at 539. Here, in assigning Allah to Administrative Segregation in October 2010, prison officials made no individualized assessment whatsoever of the risk that Allah posed to institutional security. Instead, they placed Allah in Administrative Segregation solely on the basis of his prior assignment to (and failure to complete) the Administrative Segregation program during a prior term of incarceration, consistent with their practice of doing so for any such inmate, unless he or she had nearly completed all three phases of the program or more than five years had elapsed since the inmate's prior term of incarceration.[5]

---

[5] Although Griggs' October 4, 2010 recommendation suggests that the practice of continuing Administrative Segregation was based on guidance in the "DOC Classification Manual," *Allah*, 2016 WL 1311997, at *6, the district court did not make a finding as to that point, nor do the parties make any argument to that effect on appeal or provide a copy of the operative manual. Instead, as noted, the district court found that in practice, Administrative Segregation was continued for inmates who had been released from a prior term of incarceration while on Administrative Segregation, except in certain circumstances in which Administrative Segregation "might not be continued." *Allah*, 2016 WL 1311997, at *5. Thus, regardless of whether it was memorialized in the relevant version of the DOC Classification Manual, it remains the case that prison officials, based on the district court's findings, would continue Administrative Segregation for any inmate who had been previously assigned to the program and failed to complete it, subject to the exceptions described above.

18

That practice may serve as a useful rule of thumb for determining when an inmate who has previously been identified as a security risk is sufficiently rehabilitated, such that prison officials may want to consider whether he or she should re-enter the general prison population. We do not quarrel with the proposition that such rules of thumb may often be appropriate in guiding the many day-to-day decisions that prison officials must make to safeguard institutional security. But when such rules of thumb are applied inflexibly to justify severe restrictions on pretrial detainees at the expense of any meaningful consideration of whether those restrictions are justified by a legitimate governmental purpose, due process concerns come into play. Here, prison officials adhered reflexively to a practice that did not allow for individualized consideration of Allah's circumstances and that required him to be placed in Administrative Segregation regardless of his actual threat, if any, to institutional security. On that basis, Allah was isolated in his cell for up to 23 hours a day; required for months to wear restraints whenever out of his cell, including when showering; allowed very limited opportunities to see his family; and subjected to the numerous other restrictions described above.

Defendants argued before this Court and the district court that they

19

justifiably placed Allah in Administrative Segregation because his prior disciplinary record warranted that placement as a special security measure. We reject the factual premise of that argument, *see supra* note 4, and conclude that Allah's placement in Administrative Segregation violated due process because the placement was not based on any concern about institutional safety, but simply on Allah's prior assignment to (and failure to complete) Administrative Segregation during a prior term of incarceration. We note, however, that even had Defendants adequately considered Allah's disciplinary history, it is not clear that Allah's placement would be constitutional. Under *Wolfish*, a restriction related to a legitimate goal such as institutional security will still be punitive if it is excessively harsh. 441 U.S. at 538. Indeed,

> loading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish.

*Id.* at 539 n.20.

Here, Defendants have failed to show how certain aspects of Allah's

confinement during Phase I of Administrative Segregation were reasonably related to the ostensible goal of prison security. For instance, Defendants have not adequately explained how limiting Allah to a single, 15-minute phone call and a single, 30-minute, non-contact visit with an immediate family member per week, allowing him to keep only five pieces of mail in his cell, or permitting him to keep a radio but not a television, related to any security risk suggested by his disciplinary record. Similarly, other aspects of Allah's confinement during Phase I, although plausibly related to security concerns in general, were so excessively harsh as to be punitive. Allah was kept in solitary confinement for 23 hours a day for almost seven months. During that time, he was forced to shower in leg irons and wet underwear. He received "absolutely no programming or counseling or therapy" during that period. *Allah*, 2016 WL 1311997, at *10. That treatment may have related to prison security in the sense that it incapacitated Allah. But the extremity of the conditions imposed upon Allah come perilously close to the Supreme Court's description of "loading a detainee with chains and shackles and throwing him in a dungeon." *Wolfish*, 441 U.S. at 539 n.20. Defendants have failed to explain why such extreme treatment was necessary.

To be sure, we have upheld the placement of pretrial detainees in

Administrative Segregation in the past, including for purposes of the detainees' protection. *See Cabral*, 513 F. App'x at 103; *Taylor*, 317 F. App'x at 82. The measures imposed on Allah are not categorically out of bounds for all pretrial detainees. And courts will generally be highly deferential to judgments about the conditions of confinement necessary to protect inmates and staff, and the public outside the facility, from particularly dangerous individuals, even in pretrial detention. However, prison officials should be prepared to articulate actual reasons for imposing seemingly arbitrary and undoubtedly harsh measures on individuals who have not been convicted of a crime. *Wolfish* demands as much.

Under the circumstances of this case, prison officials' October 2010 placement of Allah in Administrative Segregation cannot be said to be reasonably related to institutional security, and Defendants have identified no other legitimate governmental purpose justifying the placement. Accordingly, we conclude that the district court "permissibly . . . infer[red] that the purpose of the governmental action [was] punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Wolfish*, 441 U.S. at 539.[6]

---

[6] It bears emphasis that this holding is rooted in Allah's status upon his readmission to DOC custody in September 2010, as a pretrial detainee. We have no occasion to assess the constitutionality of the practice of automatic assignment to Administrative

22

**II.    Qualified Immunity**

Having decided that Allah's substantive due process rights were violated, we nonetheless conclude that Defendants are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks omitted). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks and brackets omitted). Thus, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 743 (internal quotation marks omitted).

Allah argues, and the district court concluded below, that Defendants are not entitled to qualified immunity because *Wolfish* and its progeny clearly

---

Segregation as applied to inmates who are returned to DOC custody as post-conviction prisoners, and express no view on that subject.

23

established the "right to be free from punishment before guilt" under substantive due process, Appellee Br. 30, and prison officials therefore should have understood that assigning Allah to Administrative Segregation solely on the basis of his prior assignment to that program violated his constitutional rights. Allah's argument, however, sets the qualified immunity analysis at an impermissibly "high level of generality." *Al-Kidd*, 563 U.S. at 742.

We agree that *Wolfish* and its progeny put prison officials on notice that pretrial detainees have a substantive due process right not to be subjected to restrictions amounting to punishment. But just as "[t]he general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established," *Al-Kidd*, 563 U.S. at 742, the general principle articulated in *Wolfish* does not clearly establish that a substantive due process violation would result from Allah's placement in Administrative Segregation based solely on his prior assignment to (and failure to complete) that program. Nor does Allah identify any other case law that would have placed Defendants on notice that their conduct violated substantive due process. *See Dean v. Blumenthal*, 577 F.3d 60, 68 (2d Cir. 2009) (noting that in assessing whether a right is clearly

24

established, we look to "the decisional law of the Supreme Court and the applicable Circuit court"). Rather, as the district court noted, "[t]he evidence shows that the defendants, though mistaken, were simply trying to fulfill their professional duties." *Allah*, 2016 WL 1311997, at \*15.

As noted above, in assigning Allah to Administrative Segregation, Defendants were following an established DOC practice. No prior decision of the Supreme Court or of this Court (or, so far as we are aware, of any other court) has assessed the constitutionality of that particular practice. Moreover, neither *Wolfish* nor any subsequent decision has prohibited the confinement of pretrial detainees under the conditions imposed here if those conditions are imposed upon an individualized finding that a particular detainee poses a threat to security.[7] Finally, the line between using a prior assignment to Administrative

---

[7] For these reasons, we respectfully disagree with our dissenting colleague's view that *Wolfish* alone was sufficient to put prison authorities on notice that the conditions applied to Allah, based on an aspect of his particular prior history at the institution, violated the Constitution. *Wolfish* suggested that certain generalized conditions at a detention facility, applied indiscriminately to every detainee, might be so severe that they could only be regarded as punitive, and not as mere incidents of confinement so as to assure the detainees' presence at trial. 441, U.S. at 539 n.20. *Wolfish* did not hold that such conditions may never be applied to any detainee, regardless of his history or the specific risks that he may pose to the security of prison staff, other inmates, or persons in the community. Nor did it address whether restrictive conditions that could not be applied to detainees as a matter of course may, in the cases of particular detainees, be sufficiently justified by security rationales that they could not be regarded as punitive.

25

Segregation without completion of the full program as a trigger for closer scrutiny and inflexibly relegating pretrial detainees with such a prior record to renewed Administrative Segregation, although critical to the constitutionality of the determination, is a fine one that would not necessarily be apparent to prison officials in the absence of specific judicial evaluation of the practice.

Accordingly, we conclude that Defendants were entitled to qualified immunity and cannot be held liable for civil damages for violating Allah's substantive due process rights.

**CONCLUSION**

For the foregoing reasons, we REVERSE the judgment of the district court, and direct the entry of a judgment in favor of Defendants.

---

Thus, while we hold that Defendants violated the Constitution in applying highly restrictive conditions to Allah, we also recognize that in deciding what restrictions could legitimately be placed on a *particular* detainee, Defendants lacked definitive guidance from the Supreme Court or from this Court.

POOLER, *Circuit Judge*, concurring in part, dissenting in part, and dissenting from the judgment:

I concur with the majority's holding that Allah's constitutional rights were violated when prison officials failed to consider whether he posed a risk to the institution before placing him in extended solitary confinement. I would additionally hold, however, that the restraints imposed in this case were unconstitutional as a response to the minimal infraction Allah committed. And I would not afford the defendants qualified immunity for having imposed the restraints.

* * *

We must remember that Allah's misdeed in this case was the asking of a single question. As the district court found, and as defendants do not dispute, "Allah was standing with approximately fifty other inmates in his dormitory" on December 22 . . ., as they were "awaiting their turn to visit the commissary to purchase items that are sold only during the holiday season." *Almighty Supreme Born Allah v. Milling*, No. 3:11cv668, 2016 WL 1311997, at *4 (D. Conn. Apr. 4, 2016) (hereinafter "Dist. Ct. Op.").  When "[p]rison officials decided to permit inmates in [another dormitory] to go to the commissary before the inmates in

1

[Allah's dormitory]," "Allah asked the correctional officer . . . if he could speak to a lieutenant about this." *Id.* "Because of a history of riots at [the facility]," "[o]ne of the correctional officers perceived the request to talk to a lieutenant as an attempt to incite other inmates to unite and protest the delay in visiting the commissary." *Id.* Allah's question was therefore deemed a security risk. *Id.*

The defendant officials do not explain how Allah's seemingly minor request led to disorder or a breakdown of security. The officials state, vaguely, that Allah "created a significant disturbance," and "incited" a "protest." Appellant's Opening Br. at 3. But defendants do not say any protest took place. Nor do they explain how Allah's question might have caused one. Nor do they state that anyone was harmed, or explain specifically why or how harm might have resulted from Allah's question.

For this conduct, defendants placed Allah in solitary confinement for more than a year, spread across two terms of incarceration. During part of that time, he was a pretrial detainee, which means that any restraints imposed upon him must be evaluated in light of *Bell v. Wolfish*, 441 U.S. 520 (1979), the leading case explaining what conditions may lawfully be imposed upon pretrial detainees.

2

In *Wolfish*, the Supreme Court explained that "the proper inquiry" for whether conditions may be imposed upon a pretrial detainee "is whether those conditions amount to punishment of the detainee." *Id.* at 535. "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* Because "[a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime," a condition that amounts to punishment of the detainee is unlawful. *Id.* at 536.

The Supreme Court provided the following guidance for determining whether a condition imposed upon pretrial detainees amounted to unconstitutional punishment:

> A court must decide whether the [condition] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on [1] whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and [2] whether it appears excessive in relation to the alternative purpose assigned to it. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal–if it is arbitrary or purposeless–a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

3

*Id.* at 538–39 (internal quotation marks, citations, footnotes, and brackets omitted). The Supreme Court thus set forth a two-part test for evaluating whether a condition of confinement amounts to an unconstitutional punishment of a pretrial detainee. We must ask, first, whether there is a non-punitive purpose rationally connected to a given condition, and, second, whether the condition is proportional to that purpose: whether it is an excessive means for accomplishing the purpose.

The Supreme Court provided an illustration of this test, describing a scenario in which certain conditions are related to non-punitive purposes, but would nevertheless be disproportionate means of achieving those purposes:

> [L]oading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish.

*Id.* at 539 n.20.

Several of the conditions in this case do not pass the test articulated in *Wolfish*, particularly in light of the Supreme Court's example. First, as the majority suggests, some conditions imposed on Allah related only to punishing him. Neither here, nor in the district court, did the officials explain how limiting

4

Allah to five pieces of mail at a time related to any goal but punishment. *See* Dist. Ct. Op. at *9 (concluding that "the defendants could not explain (nor can the Court) how limiting . . . a pretrial detainee[] to having only five pieces of mail in his cell was reasonably related to a security concern"). The same is true of the rules limiting him to one phone call and one family visit per week. *Id.* These conditions should be held unconstitutional as imposed on Allah, particularly in that they have no relationship at all to his infraction.

Similarly, there is no good argument that Allah's asking of a single question justifies more than a year of solitary confinement, much of it under oppressive conditions. Dist. Ct. Op. at *3, *4-7. For many months during his time as a pretrial detainee, Allah spent twenty-three hours per day alone in his cell. *Id.* at *6. He was required to wear leg irons, and shackles behind his back, when he exited. *Id.* at *6. The leg irons stayed on even when he showered. *Id.* at *6. He had few visits with family, few phone calls, and few other privileges. *Id.* at *3.

I do not see how these conditions were materially different from "loading [him] with chains and shackles and throwing him in a dungeon." *Wolfish*, 441 U.S. at 539 n.20. Allah was isolated from others and could not walk anywhere without total restraint and supervision. He endured these conditions for a long

5

period of time. The Supreme Court's purpose in employing the above-quoted example was to show that near-total physical restrictions could only be justified by a significant government interest. Allah endured such restrictions without any apparent interest justifying them.

The majority's analysis of this case is that Allah's treatment was unconstitutional, but not because it was excessive in light of his minor infraction. The majority believes that Allah was put into Administrative Segregation only due to the policy of automatically placing detainees in Administrative Segregation as a result of their previous placement there. *See* Slip Op. at 19-20 n.6. It appears, however, that the district court addressed this policy only because the court viewed the defendants' principal justification for the restraints—i.e., their security concerns—as obviously wanting. *See* Dist. Ct. Op. at *9. Moreover, on appeal, defendants have primarily argued that they correctly placed Allah within Administrative Segregation because "he was a threat to safety and security," Appellants' Opening Br. at 13, 15, 20, 27. Nevertheless, the majority holds that the treatment was unlawful because it was based on the policy of automatically placing detainees in Administrative Segregation as a result of their previous placement in that program.

Even if the majority is correct that Allah was punished based on that policy, I would still deny the officials qualified immunity. As the majority notes, and as I agree, the policy "was not reasonably related to any legitimate government interest" at all. Slip Op. at 19-20 n.6. *Wolfish* squarely stated that officials must have a very significant justification for "loading a [pretrial] detainee with chains and shackles and throwing him in a dungeon." 441 U.S. at 539 n.20. Imposing such restraints upon a detainee without *any* justification clearly does not comport with *Wolfish*.

In light of the similarity of Allah's conditions to the Supreme Court's example in *Wolfish*, and in light of the lack of legitimate government interest in instituting those conditions, I would not afford the defendants qualified immunity. Accordingly, I dissent from the portion of the majority's opinion granting immunity to the officials and from its disposition reversing the judgment below.