**Electronically Filed
Supreme Court
SCWC-14-0000914
02-NOV-2018
09:19 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

MUKADIN GORDON,
Petitioner/Plaintiff-Appellant,

vs.

JODIE F. MAESAKA-HIRATA; PETRA CHO; and STATE OF HAWAI'I,
Respondents/Defendants-Appellees.

_____

SCWC-14-0000914

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0000914; CIV. NO. 11-1-2482)

NOVEMBER 2, 2018

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND POLLACK, JJ.,
WITH WILSON, J., DISSENTING

OPINION OF THE COURT BY McKENNA, J.

## I.    Introduction

Pretrial detainees — individuals who have been arrested and charged, but remain in jail while awaiting trial — have a due process right to be free from punishment until convicted of a crime.  Bell v. Wolfish, 441 U.S. 520, 535 (1979).  Mukadin Gordon ("Gordon") filed suit because he was held in solitary

confinement by State of Hawai'i ("State") prison officials for more than nine months following his arrest in August 2010. Gordon requested monetary damages pursuant to Title 42, Section 1983 of the United States Code ("U.S.C.") and state tort law. Following a jury-waived trial, the Circuit Court of the First Circuit ("circuit court")[1] entered judgment in favor of the defendants on all claims. The Intermediate Court of Appeals ("ICA") affirmed.

We hold that Gordon's placement in solitary confinement for more than nine months constituted unlawful pretrial punishment in violation of the due process clauses of the Fourteenth Amendment to the United States Constitution and Article I, Section 5 of the Constitution of the State of Hawai'i. We also hold, however, that although the circuit court applied an incorrect standard for federal qualified immunity, defendant Petra Cho ("Cho") is not liable for damages under 42 U.S.C. § 1983 for the federal constitutional violation because the basis of her decision to retain Gordon in pretrial solitary confinement did not violate a clearly established constitutional right of which every reasonable official would have known. We also hold the circuit court did not err by concluding Cho has no negligence liability based on state qualified immunity

---

[1] The Honorable Edwin C. Nacino presided.

principles.  In addition, as the State has not waived sovereign immunity for damages claims based on state constitutional violations, the State is not liable for damages for the state constitutional violation.

We therefore overrule the ICA's memorandum opinion insofar as it conflicts with our conclusions herein, but affirm the ICA's judgment on appeal in favor of the defendants.

## II.  Background

### A.  Circuit Court Pretrial Proceedings

Gordon filed a civil complaint arising from his pretrial detention at the Oahu Community Correctional Center ("OCCC") and the Halawa Correctional Facility ("HCF").  He alleged he was incorrectly classified as a maximum security pretrial detainee and placed in solitary confinement for a total of nine months and twenty-two days between 2010 and 2011.[2]

In this opinion, we address only the claims asserted by Gordon in his amended complaint against Cho and the State (collectively, "the Defendants") that he continues to assert on appeal.[3]  Through his first cause of action, Gordon alleges a 42

---

[2]  Gordon's Application for Writ of Certiorari asserts he spent nine months and twenty-two days in solitary confinement.  His amended complaint alleges it was about nine months and twenty-four days.  At trial, Gordon's counsel represented the time period lasted 296 days.

[3]  Many of the original individual defendants were dismissed or replaced as parties at or prior to trial.  Gordon's original complaint included claims against defendants Clayton Frank, Francis Sequiera, William Rushing, Faatuila Pula, Michael Taamilo, Aaron Mirafuentes, and Gene Pomeroy.  Clayton Frank

(continued. . .)

3

U.S.C. § 1983 claim for violation of his right to due process under the Fourteenth Amendment to the United States Constitution against Cho; he also alleges a violation of his right to due process under Article I, Section 5 of the Constitution of the State of Hawai'i against the State. Through his fourth cause of action, he alleges negligence against Cho. Gordon seeks general, special, and punitive damages, attorneys' fees and costs, and such other relief as deemed appropriate.

**B.    Circuit Court Trial**

The circuit court conducted a two-day jury-waived/bench trial that decided Gordon's federal 42 U.S.C. § 1983 claim against Cho in her individual capacity and his state negligence claim against Cho.

---

(. . . continued)
was replaced by Jodie F. Maesaka-Hirata in Gordon's amended complaint. Faatuila Pula was dismissed by stipulation before trial. At trial, Gordon orally moved to dismiss the claims against Francis Sequiera, William Rushing, Michael Taamilo, Aaron Mirafuentes, and Gene Pomeroy. An order dismissing with prejudice all claims against those defendants was filed after trial.

Many causes of action were also dismissed or are no longer being pursued on appeal. In his first cause of action, Gordon originally asserted 42 U.S.C. § 1983 claims for alleged violations of his rights under the Fourth, Eighth, and Ninth Amendments to the United States Constitution, and he also alleged violations of Article I, Sections 2, 6, 7, 8, and 12 of the Constitution of the State of Hawai'i. He also alleged intentional infliction of emotional distress against the individual defendants in the second cause of action, negligent infliction of emotional distress in the third cause of action, and negligent training, supervision, and/or discipline by Jodie F. Maesaka-Hirata and the State in the fifth cause of action.

Before trial, the circuit court granted the Defendants' motion for summary judgment in part, dismissing Gordon's 42 U.S.C. § 1983 claims against the State and the individual defendants in their official capacities, but denying the motion with respect to Gordon's 42 U.S.C. § 1983 and negligence claims against Cho.

### 1.    The circuit court's findings of fact

The circuit court found the following facts relevant to the issues on certiorari.

#### a.    Gordon's pretrial detention

On August 22, 2010, Gordon was arrested on charges of seven counts of sexual assault in the first degree, one count of attempted sexual assault in the first degree, four counts of sexual assault in the third degree, one count of promoting prostitution, and one count of kidnapping in the first degree. From August 26, 2010, to June 16, 2011, Gordon was held in maximum security custody at OCCC and HCF while he awaited trial on his criminal case.

#### b.    Initial custody classification and conditions

On August 26, 2010, Department of Public Safety ("DPS") employee Faatuila Pula ("Pula") conducted Gordon's initial intake interview at OCCC and filled out a Jail Initial Custody Instrument ("Initial Custody Instrument") to determine his custody status.  This document was completed using information from the Hawai'i Criminal Justice Inquiry System, the National Crime Information Center, and a brief interview with Gordon.[4]

---

[4]    The Initial Custody Instrument established Gordon's custody status by assigning predetermined point values to various aspects of his personal, criminal, and institutional history.  Specifically, the Initial Custody Instrument evaluated Gordon's age, the severity of his current charges, his prior convictions, his "history of assaultive behavior," his escape history, and his "pending charges or detainer."  Gordon's history of prior convictions

(continued. . .)

After completing the Initial Custody Instrument, Pula determined that Gordon had a total of nineteen "points" and accordingly classified Gordon as a maximum custody detainee.[5]

Based on this custody classification, Gordon was placed in maximum security custody in the OCCC Holding Unit for thirty days. While there, Gordon was alone in a small cell for twenty-three hours per day, had limited access to showers and reading materials, and was not permitted any phone calls. Gordon requested mental health services during the one-month detainment in the OCCC Holding Unit, but was never provided with any.

### c. September 2010 custody evaluation

On September 22, 2010, an administrative program committee ("the Committee") conducted a hearing to further evaluate Gordon's security custody classification, programming needs, and whether housing at OCCC was appropriate for him. Cho, a DPS correctional supervisor, was the Committee's chairperson.[6] When evaluating an inmate's security classification and housing

---

(. . . continued)
and "history of assaultive behavior" both took into account the number and severity of his prior convictions, including petty misdemeanors, misdemeanors, and felonies.

[5] According to the Initial Custody Instrument, a score of zero to eight points yielded a security classification of minimum custody, a score of nine to seventeen points resulted in a classification of medium custody, and a score of eighteen points or greater resulted in a maximum custody classification.

[6] The other members of the Committee were Aaron Mirafuentes and Michael Taamilo, who were dismissed as defendants at trial.

needs, the Committee can consider "all aspects regarding an inmate," including the inmate's institutional file, current charges, prior convictions, and the inmate's own testimony. Accordingly, Cho and the Committee considered Gordon's own statements that he did not think he should be a maximum custody detainee, had done reasonably well at OCCC, and that there was an error concerning his initial custody classification because it was based in part on charges that were not actually pending.[7]

The Committee decided, however, that Gordon should remain at the maximum custody level and should be housed at HCF High Security. It notified him of this decision in a written document designated as an "Amended Notice of Programming Results" ("Programming Results"). The Programming Results acknowledged that Gordon had "not received any major misconducts" since being admitted to OCCC. However, Cho and the Committee decided that Gordon should remain as a maximum custody detainee, in solitary confinement, for the following reasons:

- The nature and seriousness of his current charges;
- The number and kind of his prior convictions;
- His extensive criminal history and numerous periods of incarceration;
- His failure to comply with two residential drug treatment programs;

---

[7] Based on her review of the Hawai'i Criminal Justice Inquiry System, Pula believed that Gordon had an unrelated but pending Sex Assault in the First Degree charge in Hawai'i, and Gordon's failure to appear at a hearing for that charge was counted as a pending or no-show appearance for calculating his custody status. Sometime after his initial classification, it was discovered that Gordon did not actually have a pending sexual assault charge; the 2006 charge had in fact been resolved before he was arrested in August 2010.

- Leaving the state without permission while on probation;
- His extradition to Hawaii;
- The fact that [Gordon] was on probation when charged with his current offenses;[8]
- His $1,000,000.00 bail amount; and
- [O]ther factors identified in the committee's Amended Notice of Programming Results.

Additionally, the Committee noted Gordon's probation status, unpaid restitution amounts, and the opinion of his probation officer that his case was "questionable."[9] The Committee provided final comments explaining its decision:

> The Committee concurs with [the Initial Custody Instrument] that classified Mr. GORDON as MAX and also recommends that he be housed accordingly at Halawa High Security. The Committee deems MR. GORDON a high-risk inmate and also, a high flight risk. OCCC is inappropriate housing for Mr. GORDON because OCCC is not able to provide MR. GORDON with the high degree of direct supervision that he requires.

According to Cho, an inmate classified as maximum security "needs more direct supervision" by correctional officers, especially when outside of his or her cell, and the Committee felt that OCCC was unable to provide the level of supervision required for Gordon. In evaluating his custody status, Cho

---

[8] The State represents that "Gordon was arrested and detained as a pretrial detainee" **[39:2]** and does not argue that Gordon was held in custody for alleged violations of conditions of probation for offenses for which he had already been convicted. This case is therefore analyzed based on the constitutional rights of pretrial detainees, who cannot be subjected to punishment. Bell, 441 U.S. at 535. Regardless, post-conviction defendants still have constitutional rights against cruel and unusual punishment. See Bell, 441 U.S. at 535 n.16 ("A sentenced inmate . . . may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment."); State v. Guidry, 105 Hawai'i 222, 237, 96 P.3d 242, 257 (2004) (explaining the proportionality test of the prohibition on "cruel and unusual" punishment in Article I, Section 12 of the Hawai'i Constitution).

[9] The Programming Results did not indicate when or how the Committee learned the probation officer's opinion, nor did it indicate which case — Gordon's pending case or his probation case — was "questionable," or what "questionable" meant.

never harbored malice or ill-will toward Gordon and did not believe Gordon was punished when he was placed in maximum custody conditions.

Gordon filed a grievance challenging the Committee's decision on September 29, 2010.

### d.   October 2010 Exception Case Form

On October 5, 2010, Cho received a memorandum from her supervisor, Lance Rabacal ("Rabacal").  The memorandum instructed Cho to "adhere to the directive process that has been consistently utilized at our facility pertaining to MAX custody inmates," which was attached.  That memorandum, originally written by a former OCCC warden in November 1996, laid out the State's "arrangement with the ACLU" ("ACLU Memo") regarding procedures for processing maximum custody pretrial detainees.  The ACLU Memo provided that pretrial detainees classified as maximum custody "shall be housed in the [OCCC] Holding Unit for 30 days," and "[i]f the inmate remains misconduct free and is not a management problem, OCCC shall then reduce the inmate's custody to Medium and re-house in general population."  It also provided that "if the inmate incurs misconducts during the 30-day period, and/or is a management problem, he shall be transferred to HCF as a Max custody."  According to Rabacal, the ACLU Memo was "used as a guideline to determine when a recommendation to reduce custody" should be considered.

On or about October 12, 2010, an Exception Case Form was started for Gordon under Cho's name. This form noted that Gordon had "not shown nor accrued any institutional behavioral misconducts within the OCCC holding unit" and recommended a medium custody classification "[b]ased on 10/5/10 OCCC MAX CUSTODY INMATES directive from Lance Rabacal." The Exception Case Form was sent to the DPS Classification Office, which considers the totality of the circumstances when making the decision to reduce or maintain an inmate's custody level.

Linda Chun ("Chun"), an officer in the Classification Office, denied Gordon's Exception Case Form on October 19, 2010. Chun recorded the reasoning for her decision on the Exception Case Form itself, noting Gordon's behavior in the OCCC Holding Unit had been satisfactory thus far, but explaining that she thought he should remain in maximum custody for the following reasons:

> [T]his case still presents a number of risk factors. Current charges are serious & violent in nature. As a result, subject has a high bail amount. Subject has an extensive criminal history & also has had numerous periods of incarceration. Subject has failed to profit from previous experience with probation and incarceration. Substance abuse issues have not been addressed due to subject's discharge from program for non-compliance with program rules.

Chun believed, based on her training, experience, and the reasons she cited, that it was reasonable to place a pretrial detainee in maximum security housing.

The disapproved Exception Case Form was submitted to Deputy Director of Corrections Tommy Johnson ("Johnson") for review. On October 21, 2010, Johnson denied Gordon's request because he believed Chun's statements on the Exception Case Form were true, although he had no personal knowledge of the basis for the statements. Johnson did not believe Gordon's custody level was punishment.

### e.   Subsequent grievances and conditions at HCF

From September 29, 2010, through March 24, 2011, Gordon filed eight Inmate Complaint/Grievances challenging his classification and placement in solitary confinement. Gordon sought reclassification to medium custody and transfer to OCCC, but none of his grievances were granted.

Gordon was transferred to HCF on October 25, 2010, and was placed in maximum custody. As a pretrial detainee at HCF, he was alone in his cell for twenty-three hours per day, was given forty-five minutes to an hour of recreational time five days a week, had no access to a shower on weekends, and was only allowed noncontact visits with his attorney. He was strip searched daily and searched again each time he returned to his cell. Gordon had limited access to phone calls, did not have access to a commissary, and was denied access to programs.

According to Monica Lortz ("Lortz"), an HCF Corrections Supervisor, DPS policy requires the custody status of every

11

maximum custody inmate, whether pretrial detainee or sentenced prisoner, to be reassessed once a year. In June 2011, at the instruction of the deputy warden and after Gordon had been at HCF for eight months, Lortz reevaluated Gordon's custody status using a Jail Inmate Custody Review Instrument ("Custody Review Instrument"). After completing the Custody Review Instrument, Lortz assigned Gordon a total of thirteen points, which corresponded to a medium custody level.[10] Gordon's custody level was therefore reduced from maximum to medium, and he was returned to OCCC on June 16, 2011.

After Gordon was sentenced for his pending charges in September 2011, he was returned to HCF.[11] At the time of the trial in his civil case, Gordon was held at HCF in medium security custody.

### 2. The circuit court's conclusions of law

The circuit court rendered the following conclusions of law relevant to the issues on certiorari.

---

[10] The Custody Review Instrument employed a point system similar to the Initial Custody Instrument, but limited its consideration of Gordon's criminal history to felony convictions and escapes within the past ten years, and institutional misconduct within the past twelve months. According to the Custody Review Instrument, male inmates with a total of zero to nine points resulted in a security classification of minimum custody, ten to fifteen points resulted in a medium custody classification, and a point total greater than sixteen resulted in a maximum custody classification.

[11] Gordon testified that he was eventually convicted of "sex assault, promotion of prostitution, kidnapping, and drug promotion" in August 2011, and was sentenced to ten years of imprisonment with the possibility of parole, with a mandatory minimum of three years and four months.

12

### a.  Gordon's 42 U.S.C. § 1983 claim

Citing the United States Supreme Court's opinion in Bell, the circuit court stated that pre-trial detainees have a substantive due process right against custodial restrictions that amount to punishment, but also that not every condition imposed during pretrial detention amounts to punishment.  To determine whether a condition is punishment, the circuit court determined that it must look to whether the restrictions evince a punitive purpose or intent, and in the absence of an express intent to punish, it must then consider whether punitive intent can be inferred from the nature of the restriction.  The circuit court further noted that whether punitive intent can be inferred generally turns upon whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether the restriction appears excessive in relation to the alternative purpose assigned to it.

The circuit court concluded that Gordon's constitutional rights were not violated based on the lack of substantive evidence showing that Defendants categorized him as a maximum custody pre-trial detainee purely to impose punishment upon him. Furthermore, the circuit court concluded the conditions to which Gordon was subject as a maximum custody detainee were "reasonably related to a legitimate government objective which is to maintain a safe and secure correctional facility," and

13

were no different from the restrictions and conditions of any other maximum custody inmates. The circuit court also concluded that Gordon did not prove "that the conditions of maximum custody imposed by Defendants to maintain a safe and secure correctional facility were excessive to accomplish such objective nor expressly intended as punishment," and that "the restrictions and conditions [Gordon] was subjected to did not amount to punishment."[12]

Determining that Cho complied with the guidelines of the ACLU Memo, the circuit court also concluded that Cho was

---

[12] The circuit court compared Gordon's case to a number of earlier federal cases:

> Based on the totality of the facts, various documents in evidence and credible trial testimony and the lack of any evidence to the contrary, the court concludes that the restrictions and conditions [Gordon] was subjected to did not amount to punishment. Compare [Bell, 441 U.S. 520] (holding that double-bunking, body-cavity searches, the prohibition against the receipt of packages, or the room-search only rule did not amount to punishment under the facts of the case), and Brock v. Rutherford, 468 U.S. 576 (U.S. 1984) (holding that a blanket prohibition on contact visits with pretrial detainees and shakedown searches of pretrial detainees' cells outside their presence does not amount to punishment), with Anela v. Wildwood, 790 F.2d 1063 (3rd Cir. N.J. 1986) (holding that failing to provide beds or mattresses and food and drinking water amounted to punishment), and Demery v. Arpaio, 378 F.3d 1020, 1033 (9th Cir. Ariz. 2004) (holding that the sheriff's policy of transmitting live images over the internet of pretrial detainees by webcam was an excessive response to the purpose assigned to it).

None of these cases dealt with solitary confinement, although Bell and Brock addressed searches and non-contact visitation similar to what Gordon experienced. Gordon's claim appears to challenge his maximum security classification as a whole, rather than any specific procedure. We therefore address whether maximum security custody as a whole, as Gordon experienced it, amounted to punishment.

entitled to qualified immunity from Gordon's 42 U.S.C. § 1983 claims "because she did not knowingly violate [Gordon's] Constitutional rights" and Gordon did not suffer punishment.

### b. Gordon's negligence claim

The circuit court determined that "Cho, individually, is afforded the protections of a qualified privilege as to [Gordon]'s state law claims because [Gordon] did not prove by clear and convincing evidence that Defendant Cho was motivated by malice and not by an otherwise proper purpose." Accordingly, the circuit court ordered judgment to be entered for Cho.[13]

### C. ICA Proceedings

On appeal, Gordon challenged the circuit court's findings and conclusions that (1) Gordon's initial custody classification was correct; (2) the conditions to which he was subjected did not constitute punishment; (3) the Defendants acted reasonably in their application of their classification procedure; and (4) Cho was entitled to qualified immunity.

In a memorandum opinion, the ICA affirmed the circuit court's judgment. Gordon v. Maesaka-Hirata, No. CAAP-14-914 (App. May 30, 2017) (mem. op.) at 2, 28. The ICA noted that in

---

[13] The circuit court did not address Gordon's state constitutional due process claim. It also did not specifically address Gordon's intentional infliction of emotional distress claim. In any event, the circuit court concluded the Defendants were not liable for negligent infliction of emotional distress, which required less proof, and Gordon does not pursue the emotional distress causes of action on certiorari.

15

deciding to keep Gordon in maximum security custody, Cho and the Committee, as well as Chun in the Classification Office, relied on factors such as "the nature of the current charges, bail amount, criminal history, failure to complete probation, and unaddressed substance abuse issues[.]" Gordon, mem. op. at 19-20. The ICA concluded that these factors, among other things, provided "substantial evidence [to] support . . . the Circuit Court's conclusion that the individual prison officials acted reasonably in keeping Gordon in Max Custody." Gordon, mem. op. at 19.

The ICA acknowledged that "while Gordon has no constitutional right to a certain classification, he possesses a right to be free from punishment prior to an adjudication of guilt." Gordon, mem. op. at 23. "[O]n the totality of the record of this case," the ICA concluded that the circuit court did not err "in determining that Gordon's Max Custody did not constitute pre-trial punishment." Gordon, mem. op. at 20. In the ICA's view, "Gordon cite[d] no evidence or legal authority that his Max Custody classification constituted punishment" and "the evidence led to the conclusion that the conditions were reasonably related to legitimate government objectives related to the safety and security of the correctional facilities and that they were not excessive for that purpose." Gordon, mem. op. at 19-20.

16

The ICA determined Gordon did not show evidence of punitive intent and failed to show there was no alternative reason for his treatment other than punishment, or that his treatment was excessive in relation to its alternative purpose.  Gordon, mem. op. at 24.  The ICA also observed that Gordon "failed to establish that the procedure detailed in the ACLU Memo is guaranteed to him" or that it otherwise overrides the deference owed to prison officials.  Gordon, mem. op. at 24-25.  The ICA concluded, instead, that "[t]he reasons for keeping Gordon in Max Custody were clearly articulated and appear to be related to the legitimate nonpunitive governmental objective of security and safety.  Gordon has not shown that he was subject to an arbitrary action of government."  Gordon, mem. op. at 25, (citing Wolff v. McDonnell, 418 U.S. 539, 558 (1974)).

Finally, with respect to Cho's state law qualified immunity, the ICA held that the circuit court did not err and that Gordon failed "to meet his burden under [Towse v. State, 64 Haw. 624, 647 P.2d 696 (1982),] to establish that Cho was motivated by malice or otherwise improper purpose."  Gordon, mem. op. at 26-27.

**D.   Application for Writ of Certiorari**

Gordon presents three questions in his application for writ of certiorari ("Application"):

> A. Whether the ICA gravely erred in holding that the restrictions and conditions of Petitioner's solitary

confinement in Maximum Custody for nine months and twenty-two days did not constitute unlawful pretrial punishment where, inter alia, (1) Petitioner was locked in an isolation cell for approximately twenty-three hours each day, (2) Petitioner was generally allowed only non-contact visits with his attorney, and (3) Petitioner was subjected to multiple strip searches on a daily basis.

B. Whether the ICA gravely erred in holding that [DPS] officials did not act arbitrarily and capriciously in holding Petitioner in Maximum Custody where (1) Petitioner's initial custody level was calculated incorrectly; (2) DPS failed to abide by established inmate classification policies and procedures; and (3) Petitioner was not an escape risk, had never assaulted anyone while in prison, and had never been a threat to prison discipline and good order.

C. Whether the ICA gravely erred in holding that Respondent PETRA CHO was entitled to qualified immunity and that Petitioner failed to establish that Respondent CHO was motivated by malice and not by an otherwise proper purpose in confining Petitioner to Maximum Custody where (1) the incorrect calculation resulting in Petitioner's initial custody level was known to Respondent CHO, and (2) Respondent CHO refused to correct Petitioner's erroneous custody classification within a reasonable period of time.

**[SC DOC 1:2]**

## III.  Standards of Review

A trial court's findings of fact are reviewed under the clearly erroneous standard:

> A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. A finding of fact is also clearly erroneous when the record lacks substantial evidence to support the finding.  We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

In re Grievance Arbitration Between State of Haw. Org. of Police Officers ("SHOPO"), 135 Hawai'i 456, 461–62, 353 P.3d 998, 1003–04 (2015) (quoting Daiichi Haw. Real Estate Corp. v. Lichter, 103 Hawai'i 325, 337, 82 P.3d 411, 423 (2003)).

18

Conclusions of law are ordinarily reviewed under the right/wrong standard. Estate of Klink ex rel. Klink v. State, 113 Hawai'i 332, 351, 152 P.3d 504, 523 (2007). A conclusion of law that is supported by the trial court's findings of fact and reflects an application of the correct rule of law will not be overturned. 113 Hawai'i at 351, 152 P.3d at 523. However, when a conclusion of law presents mixed questions of fact and law, we review it under the clearly erroneous standard because the court's conclusions are dependent on the facts and circumstances of each individual case. 113 Hawai'i at 351, 152 P.3d at 523. Additionally, in reviewing a trial court's decision, that court's label of a finding of fact or conclusion of law is not determinative of the standard of review. Crosby v. State Dep't of Budget & Fin., 76 Hawai'i 332, 340, 876 P.2d 1300, 1308 (1994).

## IV. Discussion

### A. Gordon's 42 U.S.C. § 1983 Claim

In establishing a civil action for deprivation of rights, 42 U.S.C. § 1983 provides, in relevant part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

19

42 U.S.C. § 1983 (1996).

Gordon's 42 U.S.C. 1983 claim arises from his assertion that the conditions of his pretrial detainment, more than nine months in what amounted to solitary confinement, constituted punishment in violation of his due process rights under the Fourteenth Amendment of the United States Constitution.[14]  **[SC DOC 1:7]**  "To make out a cause of action under section 1983, plaintiffs must plead that (1) the defendants acting under color of state law (2) deprived plaintiffs of rights secured by the Constitution or federal statutes."  Gibson v. United States, 781 F.2d 1334, 1338 (9th Cir. 1986) (citation omitted).  A defendant acts "under color of state law" when the defendant exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  United States v. Classic, 313 U.S. 299, 326 (1941) (citations omitted).  The Defendants have never disputed that Cho, a DPS correctional supervisor, acted under color of state law when she and the Committee rendered their custody decision.

---

[14]  Gordon's Amended Complaint asserted that the Defendants violated his due process rights under the Hawai'i State Constitution as well.  However, 42 U.S.C. § 1983 claims can only arise under federal laws and the federal constitution.  See Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979) ("It is for violations of such constitutional and statutory rights that 42 U.S.C. § 1983 authorizes redress; that section is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes.").

Rather, this case turns on whether Gordon proved that Cho violated his rights under federal law.[15]

Under the due process clause of the Fourteenth Amendment to the United States Constitution, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."[16]  Bell, 441 U.S. at 536.  "A person lawfully committed to pretrial detention has not been adjudged guilty of any crime," and therefore while "the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility," the government may only do so if those conditions of confinement "do not amount to punishment, or otherwise violate the Constitution."[17]  441 U.S. at 536-37.

---

[15]   Although Gordon's Application does not explicitly restrict his 42 U.S.C. § 1983 claim to Cho, such actions are available against government officials in their individual capacity only.  See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  Furthermore, it appears Gordon's claims against Jodie F. Maesaka-Hirata involve only state law negligent supervision and training theories, which Gordon has not pursued on certiorari.

[16]   Bell addressed conditions at a federal detention facility, and therefore rested on the due process clause of the Fifth Amendment.  441 U.S. at 530.  However, the Bell court noted that when states seek to impose punishment without an adjudication of guilt, "the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment."  Bell, 441 U.S. at 535 n.16 (quoting Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977)).

[17]   Pretrial detainees may be punished for violating prison rules if they are afforded due process for those violations.  See, e.g., Mitchell v. Dupnik, 75 F.3d 517, 524 (9th Cir. 1996) (opining that Bell recognized prison officials' need to preserve "internal order and discipline," and holding "pretrial detainees may be subjected to disciplinary segregation only with a due process hearing to determine whether they have in fact violated any rule.").  What Bell makes clear is that prison officials cannot, even

(continued. . .)

"Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense," and indeed, pretrial detainees are to expect some lawful curtailment of their liberties.  See Bell, 441 U.S. at 537 ("[T]he fact that . . . detention interferes with the detainee's understandable desire to live . . . with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into punishment.").  Restrictions "that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial."  441 U.S. at 540.[18]

Courts must therefore decide whether the condition of confinement "is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental

_____

(. . . continued)
unintentionally, punish detainees for the crimes for which they were arrested until there has been "an adjudication of guilt in accordance with due process of law" — in other words, a conviction.  441 U.S. at 535; accord Sandin v. Conner, 515 U.S. 472, 484 (1995) (characterizing Bell as expressing "concern that a State would attempt to punish a detainee for the crime for which he was indicted via preconviction holding conditions").

[18]  Bell, a case challenging the constitutionality of conditions of confinement in a federally operated short-term custodial facility, held that "double-bunking" of inmates; a rule prohibiting inmates from receiving hardback books unless mailed directly from a publisher, bookstore, or book club; a rule prohibiting inmates from receiving packages of food or personal property except for one package at Christmas; a rule prohibiting inmates from observing unannounced room inspections; and visual body cavity strip searches after every contact visit with a person from outside the institution, did not constitute unconstitutional punishment of pretrial detainees.  441 U.S at 541-42, 548-49, 553, 555, 558, 560-61.

purpose." 441 U.S. at 538 (citation omitted). The Bell court elaborated on this standard:

> Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

441 U.S. at 538-39 (citations and footnotes omitted). Thus, under Bell, a pretrial detainee's treatment amounts to punishment when: (1) there is "a showing of an expressed intent to punish on the part of detention facility officials;" (2) the condition or restriction is not "reasonably related to a legitimate goal;" or (3) the condition or restriction is "excessive in relation to the alternative purpose assigned to it." 441 U.S. at 538-39.

Courts must be mindful that a pretrial punishment claim triggers due process inquiries that "spring from constitutional requirements and . . . judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." 441 U.S. at 539. Because prison administration is difficult and its problems are not readily ascertained or solved by the judiciary, "[p]rison administrators

23

. . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and maintain institutional security."  441 U.S. at 547 (citations omitted).

The deference owed to prison officials is not unlimited, however, and must yield to constitutional principles.  See Brown v. Plata, 563 U.S. 493, 511 (2011) ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.") (citation omitted); accord Wolff, 418 U.S. at 555-56 ("There is no iron curtain drawn between the Constitution and the prisons of this country.").  Courts should defer to the expert judgment of prison officials unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response to" their institutional order, discipline, and security considerations.  Bell, 441 U.S. at 548 (quoting Pell v. Procunier, 417 U.S. 817, 827 (1974)).

Because Gordon argues all three parts of the Bell standard, we address each part in turn.

1.  **The circuit court did not err by concluding that Gordon's treatment was not the result of Cho's express intent to punish him.**

Gordon asserts he demonstrated the Defendants' "expressed intent to punish" him because he showed that when they

24

classified him, they emphasized his criminal history, pending charges, and "failure to 'profit' from prior law enforcement contacts." Their focus on these factors, he argues, makes it "apparent that DPS officials intended for [Gordon's] solitary confinement to serve as retribution and deterrence, which the United States Supreme Court has recognized as 'the traditional aims of punishment[.]'"

Gordon's only remaining 42 U.S.C. § 1983 claim is against Cho. What the other State employees may have intended is not at issue on certiorari. Although Bell did not explain the term "expressed intent," something is "express[ed]" when it is "[c]learly and unmistakably communicated" or "stated with directness and clarity." Black's Law Dictionary 701 (10th ed. 2014). The circuit court not only found the Defendants had no expressed intent to punish Gordon, but that Cho, specifically, "testified credibly that she has never had any malice or ill-will towards [Gordon] or would knowingly violate [Gordon's] constitutional rights and [Gordon] produced no evidence to the contrary." These findings of fact, which are based upon the circuit court's credibility determinations, are not clearly erroneous. See Tamashiro v. Control Specialist, Inc., 97 Hawai'i 86, 92, 34 P.3d 16, 22 (2001) ("[T]he credibility of witnesses and the weight to be given their testimony are within the

province of the trier of fact and, generally, will not be disturbed on appeal.").

The circuit court did not err in concluding Cho did not express intent to punish Gordon.  Indeed, in addition to the circuit court's finding with respect to Cho, the testimony of multiple witnesses indicates the DPS personnel handling Gordon's case believed they were following established procedure, and thought maximum security custody was not punishment for pretrial detainees with Gordon's history.[19]  For the reasons below, however, we nevertheless hold that the circuit court clearly erred in concluding the restrictions and conditions of Gordon's detainment did not amount to punishment.

2. **The circuit court erred by concluding that Gordon's treatment was reasonably related to a legitimate government purpose.**

In the absence of expressed intent to punish, "a court must look to see if a particular restriction or condition, which may

---

[19]    Pula calculated Gordon's initial custody level using only a standard DPS form and the information she had at the time.  Chun denied Gordon's case exception because, based on her experience, she thought it reasonable to place pretrial detainees in maximum security for the reasons Cho and the Committee considered.  Likewise, in reviewing Gordon's Exception Case Form, Johnson believed Chun's statements and therefore thought it was reasonable to keep Gordon in maximum custody.
     These subjective beliefs, however, are not relevant to consideration of the objective parts of the Bell test discussed below.  See Bell, 441 U.S. at 538-39 (providing two ways to identify punishment in the absence of expressed intent to punish); see also Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473-74 (2015) (opining that "proof of intent (or motive) to punish" is not required to prevail on a Bell punishment claim, and "a pretrial detainee can prevail by providing only objective evidence" that his or her treatment lacked rational relationship or was excessive in relation to a legitimate governmental purpose).

on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective." Bell, 441 U.S. at 539 n.20. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" 441 U.S. at 539. However, "if a condition or restriction is arbitrary or purposeless, a court may permissibly infer that the purpose of the government action is punishment[.]" Bell, 441 U.S. at 539. Some legitimate interests that detention facility officials may seek to further include ensuring the detainee's presence at trial, maintaining order and security at the institution, and preventing contraband from reaching detainees. 441 U.S. at 540. "Retribution and deterrence," the Bell court made clear, "are not legitimate nonpunitive governmental objectives." 441 U.S. at 539 n.20.

Gordon disputes the existence of a legitimate reason for his classification and segregation, and argues that his treatment by Cho violated his rights because it was "arbitrary and capricious."[20] The circuit court concluded "the Defendants'

---

[20] Gordon cites Coulter v. State, 116 Hawai'i 181, 185, 172 P.3d 493, 497 (2007), for the proposition that "[g]overnment action may . . . be found to be arbitrary and capricious where an agency fails to follow the rules it sets out for itself." Coulter had to do with the Hawai'i Paroling Authority's ("HPA") failure to follow its own minimum term guidelines, which it was required by statute to adopt and then obey. 116 Hawai'i at 185, 172 P.3d at 497.

Because we decided the HPA violated its own guidelines, we explicitly declined to reach the constitutional due process question. 116 Hawai'i at

(continued. . .)

conditions imposed on individuals categorized as maximum custody and, experienced by [Gordon], [were] reasonably related to a legitimate government objective which is to maintain a safe and secure correctional facility." The ICA agreed, opining the Defendants' reasons for keeping him in solitary confinement were "clearly articulated" and related to prison security and safety. Gordon, mem. op. at 11.

Upon our review of the circuit court's conclusion that the reasons Cho gave as Committee chair for continuing Gordon in maximum custody or solitary confinement were reasonably related to a legitimate government purpose, we are left with a definite and firm conviction that a mistake has been made. We conclude Cho's treatment of Gordon was not reasonably related to a legitimate, nonpunitive government interest, and therefore was punishment.

Among other things, Gordon asserts his treatment was arbitrary because his initial custody level was based on inaccurate information, which Cho failed to correct, and also because Cho failed to follow the dictates of the ACLU Memo. With respect to the ACLU Memo, the circuit court concluded that

---

(. . . continued)
185, 172 P.3d at 497. However, we did note "[t]he proposition that the government must follow the rules it sets out for itself is not controversial," and cited other authority holding that "[e]ven if an agency is not required to adopt a rule, once it has done so it must follow what it adopted." 116 Hawai'i at 185, 172 P.3d at 497 (citing Peek v. Thompson, 980 P.2d 178, 181 (Or. App. 1999)).

"by submitting the Exception Form, . . . Cho did comply with the guidelines of the [ACLU] Max Custody Memo."  The ACLU Memo, however, does not characterize itself as a "guideline" and does not address Exception Case Forms or approval by the Classification Office; instead, it plainly instructs OCCC Holding Unit staff to (1) house all new inmates classified as maximum custody in the Holding Unit for thirty days; and (2) reduce the inmate's custody status to medium and return that inmate to the OCCC general population "[i]f the inmate remains misconduct free and is not a management problem[.]"

Cho's testimony at trial was that she actually did not know the ACLU Memo existed when the Committee met to review Gordon's custody status, although she "was aware that after 30 days [the Committee] could review the inmate."  It is unclear why Cho was unaware of the ACLU Memo, or whether the procedures stated within it had been officially modified or abandoned.  But, whether or not the ACLU Memo was a guideline or a binding directive, Cho's treatment of Gordon was the result of generalized assumptions of dangerousness and flight risk not supported by the facts.[21]

---

[21]    The record reveals the Defendants employed at least four different methods of evaluating Gordon's classification:  Pula set Gordon's initial classification using the Initial Custody Instrument, Cho and the Committee performed a second evaluation, a third custody review by Chun was reviewed by Johnson, and Gordon's final evaluation was done by Lortz, using the Custody Review Instrument.

(continued. . .)

Cho and the Committee's review of Gordon's custody status was subjective:  they were permitted to consider any factor deemed relevant, with apparently unlimited discretion in weighing those factors.[22]  To justify Gordon's continued placement in maximum security custody, Cho and the Committee based their September 22, 2010 decision on factors that were not reasonably related to a legitimate government purpose.  They asserted Gordon was a "high-risk" and "high flight risk" detainee based on his pending charges, prior convictions, "discharge and failure to comply with 2 residential drug treatment programs while on probation," non-compliance with reporting to his probation officer when leaving Hawai‘i, extradition back to Hawai‘i while on probation, and the bail amount for his pending charges.  These facts, however, were not relevant to achieving the Defendants' "legitimate government purposes" of ensuring that Gordon appeared for trial and did not disrupt institutional order and security in the meantime.

Cho did not identify what kind of "high risk" Gordon presented.  There is nothing in the record that identifies the kind of conduct she feared Gordon would engage in while

_____

(. . . continued)
    We address only Cho's conduct because she is the sole defendant against whom Gordon's 42 U.S.C. § 1983 claim is pursued.

[22]    It is unclear whether DPS policy or guidelines with respect to classification review existed at the time of trial.  No written policies, aside from the ACLU emo, were offered as evidence.

detained. Although Gordon did leave Hawai'i while on probation, resulting in his extradition, there was no explanation as to how absconding while on probation relates to escape from a secure jail facility, such that Gordon would automatically be a "high flight risk." Furthermore, despite six prior incarcerations, there was no evidence that Gordon had committed any institutional misconduct, leaving little in the record to support Cho's belief that Gordon was a "high risk" inmate. Indeed, there is no evidence in the record that Cho and the Committee knew the factual bases for Gordon's prior convictions or pending charges.

Defendants never explained how Cho and the Committee's cited facts were predictors for disciplinary or management problems in custody. It is obvious that solitary confinement would effectively detain Gordon and guarantee his appearance at trial, but, under the circumstances, solitary confinement was not reasonably related to any legitimate, nonpunitive purpose. In the absence of a link between Gordon's treatment and the resolution of any real management or security problem, Gordon's conditions of confinement only achieved retribution and deterrence — "the traditional aims of punishment" — which "are not legitimate nonpunitive governmental objectives." Bell, 441 U.S. at 539 n.20 (citing Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168 (1963)); accord Demery v. Arpaio, 378 F.3d 1020, 1030-

31

31 (9th Cir. 2004) ("[D]eterrence does not qualify as a nonpunitive goal with regard to pretrial detainees.") (citation omitted).

We acknowledge that courts should ordinarily defer to prison administrators' knowledge and expertise. Bell, 441 U.S. at 547-48. On the facts in this record, however, it is apparent that Cho and the Committee's response to the threat Gordon allegedly posed was exaggerated. See Bell, 441 U.S. at 548 (encouraging deference to prison officials, unless substantial evidence in the record suggests their response to an institutional problem was exaggerated). Gordon's maximum security status meant that he was alone in a cell for twenty-three hours per day with forty-five to sixty minutes of recreational time only five days per week, no access to a shower on the weekends, only non-contact visits with his attorney, and strip searches every day and each time he returned to his cell.[23] These conditions were imposed upon Gordon because Cho had non-specific concerns about his future behavior, based on his past conduct. Cf. Bell, 441 U.S. at 559 (upholding the use of visual inspection of body cavities where officials were specifically

---

[23] The circuit court found the Defendants "presented evidence that all MAX custody inmates, whether pretrial or not, [were] treated under the same conditions as" Gordon, but that the Defendants "also presented evidence that [Gordon] was afforded additional benefits such as personal calls that were not given to other inmates on the same floor." The fact that Gordon received additional privileges does not demonstrate that he was not punished, but rather, could show that he was punished less than others.

concerned about concealment of drugs and contraband, and there had been at least one instance of attempted trafficking of contraband).

Because Cho relied on factors that were not relevant to assessing Gordon's present security needs, and focused on his past conduct without a logical connection to present or future threat, the circuit court and ICA clearly erred by concluding Gordon's  placement in solitary confinement was reasonably related to a legitimate government purpose.[24]  A pretrial detainee can present serious and persistent threats to institutional safety, security, and order, such that maximum security conditions may be necessary to restrain them.  See Bell, 441 U.S. at 546 n.28 ("There is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates.  Indeed, it may be that in certain circumstances they present a greater risk to jail security and order.").  However, the record in this case does not support the Defendants' assertions that Gordon presented such a threat.

---

[24]     The record shows Chun relied on similar reasoning in denying Gordon's exception case form, and Johnson accepted Chun's reasoning when reviewing that decision.  Chun and Johnson, however, were never defendants in this case.

We note that other aspects of Gordon's treatment may have been inconsistent with achieving the Defendants' legitimate nonpunitive goals. For example, the Initial Custody Instrument counted Gordon's misdemeanor and petty misdemeanor convictions not once, but twice:  first as part of Gordon's history of prior convictions, and again as part of his "history of assaultive behavior."  In contrast, the Custody Review Instrument counted only felonies within the last ten years, and focused on Gordon's institutional history.  It is unclear why these evaluation methods differed to such an extent.

Thus, we conclude the circuit court clearly erred by concluding Gordon's treatment by Cho was reasonably related to a legitimate governmental objective, and therefore was not punishment.

### 3. The circuit court clearly erred by concluding Gordon's treatment was not excessive in relation to a legitimate government purpose.

Under Bell, "the determination whether [pretrial] restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose." 441 U.S. at 561. Therefore, even if a pretrial detainee's treatment "is reasonably related to a legitimate governmental objective," a court may infer that the treatment is punishment if "it appears excessive in relation to the alternative purpose assigned [to it]." Bell, 441 U.S. at 538-39 (citations and footnotes omitted). For example, although "loading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution," those harsh conditions would support a conclusion that they were imposed to punish the detainee, in light of "so many alternative and less harsh methods" that could achieve the same objectives. Bell, 441 U.S. at 539 n.20.

Gordon asserts that even if there was a legitimate reason for his classification and segregation, the conditions of his

34

confinement were excessive in relation to any alternative purpose assigned to it.  Bell, 441 U.S. at 538.  In support of his argument, he emphasizes that he was held in highly restrictive conditions for more than nine months despite the fact that he had shown "exemplary inmate behavior."  The circuit court concluded "there was no evidence produced by [Gordon] to prove by a preponderance of the evidence that the conditions of maximum custody imposed by Defendants to maintain a safe and secure correctional facility were excessive to accomplish such objective[.]"  The ICA agreed.  Gordon, mem. op. at 11.

Gordon was retained in solitary confinement because Cho and the Committee suspected that he posed a "high risk" or suspected he would engage in "high flight risk" behavior.  No witness testified to any incidents of misbehavior by Gordon during the incarceration period at issue, or during any of his prior incarcerations.  No witness testified to any specific threats to institutional safety or order by Gordon.  Even after spending thirty days in the OCCC Holding Unit with no incidents of misconduct, Cho and the Committee decided Gordon was generally a "high risk" and "high flight risk" detainee based on his criminal history and current charges, among other things.  Any justification for maximum security conditions should have dissipated after the thirty-day holding period, during which Gordon failed to exhibit the problematic behavior his past

35

convictions and pending charges supposedly indicated.

The record in this case shows that Cho imposed serious restraints on a pretrial detainee who did not demonstrate a serious threat to institutional safety or order.  While solitary confinement was undoubtedly effective at ensuring Gordon's appearance at trial, like the "chains and shackles" of Bell's hypothetical dungeon, the existence of less harsh methods of achieving the same security goals supports the inference that Gordon's treatment was punishment.  See Bell, 441 U.S. at 539 n.20 (opining that harsh conditions, "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods," can support the conclusion that the conditions were imposed to inflict punishment).[25]

We emphasize that Gordon's maximum security conditions were harsh — solitary confinement has long been recognized as an "infamous punishment" used to "mark [prisoners] as examples of the just punishment of the worst crimes of the human race."  In re Medley, 134 U.S. 160, 168-170 (1890).  This point has been effectively summarized by other courts.  See, e.g., Davis v.

---

[25]    In light of the deference accorded to prison administrators in the "adoption and execution of policies and practices . . . needed to preserve internal order and discipline and to maintain institutional security," Bell, 441 U.S. at 521, the availability of alternatives and less harsh methods does not end a reviewing court's inquiry as to whether a particular pretrial restriction constitutes punishment.  Rather, the existence of such alternatives may indicate that the restriction imposed is excessive in relation to the legitimate governmental purpose of maintaining institutional safety and security.

Ayala, 135 S.Ct. 2187, 2209-11 (2015) (Kennedy, J., concurring) (summarizing the history and effects of long-term solitary confinement). We also note that scientific research now suggests even a few days in solitary confinement can have negative effects on inmates' mental health, even in inmates not previously diagnosed with mental illness. See, e.g., Williams v. Sec'y Pa. Dept. of Corr., 848 F.3d 549, 562, 566-69 (3d Cir. 2017), cert. denied 138 S.Ct. 357 (U.S. Oct. 16, 2017) (Nos. 17-53, 17-5116) (summarizing scientific studies on the effects of solitary confinement). We conclude that, in light of the lack of articulable concerns and the harshness of Gordon's confinement, the circuit court clearly erred by concluding Gordon's treatment by Cho was not excessive in relation to a legitimate nonpunitive goal.

Because we conclude that Gordon has established a constitutional violation for his 42 U.S.C. § 1983 claim against Cho, we must now address whether Cho is entitled to qualified immunity.

**4. Cho is not liable to Gordon under 42 U.S.C. § 1983 due to qualified immunity under federal law.**

The circuit court identified the federal qualified immunity standard as follows:

> 12. Government officials who perform discretionary functions have qualified immunity from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Johnson v. Fankell,

37

> 520 U.S. 911, 914-15 [(1997)]; Gabbert v. Conn, 131 F.3d 793, 799 (9th Cir. 1997).
>      13.   The qualified immunity inquiry is two-pronged. The Court must ask whether the "conduct violated a constitutional right" and whether "the right was clearly established" at the time of the alleged misconduct.  The Court may conduct this two-pronged inquiry in any order. Alston v. Read, 663 F.3d 1094, 1098 (9th Cir. Haw. 2011).

The circuit court concluded Cho was entitled to qualified

immunity "because she did not knowingly violate [Gordon's]

Constitutional rights[.]"  In so concluding, the circuit court

clearly erred.

As the circuit court initially correctly noted, the

"clearly established right" portion of the two-part qualified

immunity standard employs a reasonableness test.  Johnson, 520

U.S. at 914-15 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818

(1982)).  To be more specific, federal courts employ a

"reasonable official" test:  a right is clearly established

"when, at the time of the challenged conduct, [t]he contours of

[a] right [are] sufficiently clear that every reasonable

official would have understood that what he is doing violates

that right."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)

(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987))

(emphasis added).  This standard "do[es] not require a case

directly on point, but existing precedent must have placed the

statutory or constitutional question beyond debate."[26]  al-Kidd,

---

[26]    The Ninth Circuit Court of Appeals previously characterized the clearly established law standard as requiring "fair warning," meaning that state
                                                    (continued. . .)

563 U.S. at 741 (emphasis added); accord Reichle v. Howards, 566 U.S. 658 (2012).

The United States Supreme Court has said that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" al-Kidd, 563 U.S. at 743 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)) (emphasis added). However, an official's subjective mental state is irrelevant to the qualified immunity inquiry: rather, a court must evaluate the "objective legal reasonableness" of the official's conduct "in light of the legal rules that were 'clearly established' at the time[.]" Anderson, 483 U.S. at 639.

Thus, although the Court stated that qualified immunity does not protect those who "knowingly" violate the law, the circuit court erred when it concluded Cho was entitled to qualified immunity because she did not knowingly violate

---

(. . . continued)
officials are not entitled to qualified immunity "where the contours of the right have been defined with sufficient specificity that a state official had fair warning that [his or her] conduct deprived a victim of his [or her] rights[.]" Serrano v. Francis, 345 F.3d 1071, 1077 (9th Cir. 2003) (citations omitted). However, it appears the United States Supreme Court now requires greater specificity with respect to whether the law was "clearly established." See District of Columbia v. Wesby, 138 S.Ct. 577, 592 (2018) ("It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.")

Gordon's rights.  In other words, although Cho would not be entitled to qualified immunity if she knowingly violated Gordon's rights, she is not entitled to qualified immunity just because she did not knowingly do so.  Rather, the issue is whether Gordon's rights were sufficiently clear in September 2010 so that every reasonable official in Cho's position would have understood that Gordon's constitutional rights were being violated; the test is objective, not subjective.

Whether a right was clearly established under federal law at the time the defendant acted is a "purely legal" question. Mitchell v. Forsyth, 472 U.S. 511, 528 n.9 (1985).  That question of law is reviewable de novo on appeal.  Elder v. Holloway, 510 U.S. 510, 516 (1994).  Thus, even if the circuit court did not apply the proper standard, whether Gordon's rights were clearly established at the time Cho and the Committee made their maximum custody/solitary confinement decision is a legal question that we review de novo.

Upon a careful review, with respect to the first prong of the qualified immunity inquiry, we have concluded for the reasons stated in Part IV, Section A, subsections 2 and 3 above, that Cho's conduct violated Gordon's Fourteenth Amendment due process right to be free from pretrial punishment.  With respect to the second prong of the inquiry, however, we conclude that Cho was entitled to qualified immunity because Gordon's rights

were not sufficiently clear at the time Cho acted in 2010 so that every reasonable official in Cho's position would have understood that Gordon's constitutional rights were being violated.

In 1979, Bell made clear that pretrial detainees may not be punished for the crimes for which they were arrested before an adjudication of their guilt.  441 U.S. at 535.  Under Bell, courts may infer that conditions of confinement are punishment if they are the result of an expressed intent to punish, if they are not rationally related to a legitimate alternative purpose, or if they are excessive in relation to that legitimate alternative purpose.  441 U.S. at 538-39.  In evaluating an official's claim of qualified immunity, however, courts should not "define clearly established law at a high level of generality."  al-Kidd, 563 U.S. at 742.  Instead, the clearly established law inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (internal citation omitted).  Turning to the specific context of this case, we conclude that in 2010, the law was not sufficiently clear so that every reasonable official in Cho's position would have understood that keeping Gordon in maximum security custody, based on the criteria applied, would amount to punishment in violation of his due process rights.

In Bell, the conditions challenged were imposed on all pretrial detainees, and prison officials' explanations of the necessity of those conditions were therefore based on broad, facility-wide concerns. 441 U.S. at 541-58. In Gordon's case, prison officials imposed highly restrictive conditions on him as an individual and, at the time Cho acted, federal law provided little guidance to prison officials with respect to making security assessments of individual detainees. In 2010, it was at least clear that pretrial detainees may not be placed in highly restrictive conditions simply because they are pretrial detainees. See Lock v. Jenkins, 641 F.2d 488, 494 (7th Cir. 1981) (concluding that placing all pretrial detainees in "conditions more burdensome than those imposed on the general population of convicted felons," regardless of their individual characteristics, "amount[ed] to punishment under Bell"). However, courts largely deferred to officials' expertise in prison management. See, e.g., Block v. Rutherford, 468 U.S. 576 (1984) (upholding a ban on contact visits for pretrial detainees because "responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility."). Because the law on what conditions amount to punishment was not sufficiently developed when Cho acted in 2010, we cannot say that every reasonable official in Cho's position would have known that

keeping Gordon in solitary confinement, based on the reasons provided, was a violation of his constitutional due process rights.

To reiterate, Cho and the Committee based their September 22, 2010 decision to retain Gordon in solitary confinement based on their assessment that Gordon was a "high-risk" and "high flight risk" detainee due to his pending charges, prior convictions, "discharge and failure to comply with 2 residential drug treatment programs while on probation," non-compliance with reporting to his probation officer when leaving Hawai'i, extradition back to Hawai'i while on probation, and the bail amount for his pending charges.

At the time Cho acted in September of 2010, even though some federal district courts had previously found that solitary confinement was punishment when it was based only on pending charges or vague allegations of dangerousness, those cases are distinguishable. United States v. Lopez, 327 F. Supp. 2d 138, 142-43 (D.P.R. 2004), found that a detainee's automatic placement in administrative detention because he faced the death penalty excessive in relation to prison officials' legitimate purposes. United States v. Gotti, 755 F. Supp. 1159, 1164-65 (E.D.N.Y. 1991), found detainees' placement in administrative detention excessive in relation to prison officials' security concerns where the only justification proffered was their

pending charges, with no evidence that the detainees posed a serious threat to other inmates or the institution. Boudin v. Thomas, 533 F. Supp. 786, 791-92 (S.D.N.Y. 1982), ruled that placing a pretrial detainee in administrative detention because of "[t]he nature of her crime [and] her . . . unsubstantiated affiliation with a terrorist organization" was excessive in relation to the prison warden's legitimate purposes. In Gordon's case, additional factors to those cited in these cases were given as reasons by Cho and the Committee for keeping Gordon in solitary confinement. In addition, although "the views of the federal courts of appeals do not bind [a state supreme court] when it decides a federal constitutional question[,]" Johnson v. Williams, 568 U.S. 289, 305 (2013), they can be persuasive. In this regard, the Seventh Circuit Court of Appeals held in Rapier v. Harris, 172 F.3d 999 (7th Cir. 1999), a 42 U.S.C. § 1983 case, that even if keeping a pretrial detainee in administrative segregation constituted prohibited punishment, defendants enjoyed qualified immunity because, at the time the defendants acted, the law was not sufficiently clear to apprise them that maintaining the defendant in segregation was not sufficiently related to the legitimate government objective of maintaining good order and discipline within the facility. 172 F.3d at 1006. In addition, as late as 2017, the Second Circuit held in Almighty Supreme

Born Allah v. Milling, 876 F.3d 48 (2d Cir. 2017), that "the general principle articulated in [Bell] does not clearly establish that a substantive due process violation would result from [the pretrial inmate's] placement in Administrative Segregation based solely on his prior assignment to (and failure to complete) that [Administrative Segregation] program [during a previous incarceration]." 876 F.3d at 59. Holding that the defendants were entitled to qualified immunity, the Second Circuit noted, "[n]o prior decision of the Supreme Court or of this Court (or, so far as we are aware, of any other court) has assessed the constitutionality of that particular practice." 876 F.3d at 59-60. Likewise, we see no cases that assessed the constitutionality of the criteria evaluated by Cho and the Committee in reaching a decision that Gordon should be continued in solitary confinement.

Gordon cited as supplemental authority four federal cases that are distinguishable from this case and do not demonstrate, at the time of Cho and the Committee's decision to retain Gordon in pretrial solitary confinement, a violation of a "clearly established" constitutional right of which every reasonable official would have known of at the time the official acted. Proctor v. LeClaire, 846 F.3d 597 (2d Cir. 2017), involved a convicted defendant, not a pretrial detainee.[27] Gordon also

_____

[27] We note, however, that the ABA Criminal Justice Standards and federal
(continued. . .)

cited to Almighty, discussed in the paragraph above, which actually held that qualified immunity applied.[28]  Likewise, Williams v. Secretary Pennsylvania Department of Corrections, 848 F.3d 549, cert. denied 138 S.Ct. 357 (U.S. Oct. 16, 2017) (Nos. 17-53, 17-5116), prospectively held that inmates on death row whose death sentences have been vacated have a due process right to avoid continued placement in solitary confinement absent meaningful protections discussed therein, but also found qualified immunity applied as to the prison official defendants in that case.  Finally, the last supplemental authority cited by Gordon, V.W. by and through Williams v. Conway, 236 F. Supp. 3d 554 (N.D.N.Y. 2017), ruled that summary judgment had improperly been granted in favor of a school district in a purported class action brought on behalf of juveniles subjected to solitary confinement, but had yet to address actual liability or the possible applicability of qualified immunity, if liability was found.

Thus, like in Almighty, we see no cases that assessed the combination of criteria evaluated by Cho and the Committee in reaching their decision that Gordon may be continued in solitary

(. . . continued)
prison policy factors we discuss in Section IV(C) below for assessing when solitary confinement may be used also apply to convicted defendants.

[28]     Gordon also cited to that case when the April 25, 2018 petition for certiorari was pending before the United States Supreme Court, but the certiorari petition was dismissed by the Court on September 4, 2018.  See Docket No. 15-8654 in the United States Supreme Court.

confinement. The circuit court's conclusion that Cho was entitled to qualified immunity because she did not knowingly violate Gordon's rights was erroneous because it was based on an improper standard of law. However, because whether a right was clearly established under federal law at the time a defendant acted is a "purely legal" question reviewable de novo, and because we conclude that Gordon's rights were not sufficiently clear in 2010 that every reasonable official in Cho's position would have known that keeping Gordon in solitary confinement based on the criteria applied violated his constitutional rights, Cho is nevertheless entitled to qualified immunity.

This opinion clearly establishes for Hawai'i prison officials, however, that holding a pretrial detainee in solitary confinement under Gordon's circumstances violates a pretrial detainee's Fourteenth Amendment due process right to be free from punishment. With respect to the reasons given by Cho and the Committee[29] to maintain Gordon in maximum security and solitary confinement, "the nature and seriousness of [a detainee's] current charges" may bear some relationship to institutional order and security if the underlying facts or nature of the charges correspond to the ABA Criminal Justice Standards and federal prison policy factors for solitary

---

[29] Similar reasons were later given by Chun and Johnson.

confinement discussed in Section IV(C) below, but because defendants did not know the factual basis for Gordon's pending charges or explain how his charges could indicate a threat to institutional order and security, defendants failed to show the conditions of Gordon's pretrial custody were reasonably related to any legitimate government purpose on this basis. "The number and kind of his prior convictions" and "[h]is extensive criminal history and numerous periods of incarceration" might have been reasonably related to a legitimate government purpose to the extent they included assaultive behavior; however, in Gordon's case, he had committed no institutional misconduct during prior incarcerations. Likewise, "[h]is failure to comply with two residential drug treatment programs" might have been reasonably related to a legitimate government purpose if the failure related to possible disruption of institutional order and security; in Gordon's case, however, no such evidence existed. In addition, there was no explanation as to how Gordon's "[l]eaving the state without permission while on probation" and "extradition to Hawaii" related to possible escape from OCCC, a secure facility. His being "on probation when charged with his current offense" likewise did not bear on institutional order or security. Gordon's "$1,000,000 bail amount" also did not directly bear on possible institutional security issues,

especially in light of the lack of any institutional misconduct during prior incarcerations.[30]

Just as "loading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution," unless there is a legitimate government purpose, placement of a pretrial detainee in solitary confinement can support a conclusion that it was imposed to punish the detainee, in light of "so many alternative and less harsh methods" that could achieve the same objectives. Bell, 441 U.S. at 539 n.20. The ABA Standards and federal prison policies discussed in Section IV(C) below provide guidelines on when solitary confinement might be reasonably related to a legitimate government purpose so as not to violate a pretrial detainee's due process rights.

## B.  Gordon's State Law Negligence Claim

With respect to his negligence claim against Cho, individually, Gordon's Application argues Cho was not entitled to qualified immunity under Towse.  In Towse, we clarified our state law qualified immunity standard for non-judicial officials:

> Our courts have held that a non-judicial governmental officer does not enjoy an absolute immunity for his tortious acts. . . . [W]hen an official "in exercising his

---

[30]  Cho was not responsible for Gordon's initial custody evaluation that, in addition to these factors, also considered his age.  See supra, n.5.  We express no opinion at this time whether prison officials can consider age in evaluating custody classifications.

> authority is motivated by malice, and not by an otherwise
> proper purpose, . . . he should not escape liability for
> the injuries he causes."

64 Haw. at 630-31, 647 P.2d at 701-02 (citation omitted).

The circuit court concluded Gordon did not prove by a preponderance of the evidence that Cho acted with malice;[31] accordingly, Gordon did not meet his burden of proving malice by clear and convincing evidence.[32] See Medeiros v. Kondo, 55 Haw. 499, 504, 522 P.2d 1269, 1272 (1974) (placing "the burden of adducing clear and convincing proof that [the] defendant was motivated by malice" on the plaintiff). The circuit court's findings and conclusions with respect to Cho's qualified immunity for Gordon's state law negligence claim are not clearly erroneous.

## C.   Gordon's State Due Process Claim

The circuit court did not specifically address Gordon's state due process claim under Article I, Section 5 of the Hawai'i Constitution, which provides that "[n]o person shall be deprived of life, liberty or property without due process of law . . . ." Although the State of Hawai'i has not waived its sovereign

---

[31]   It does not appear the State raised any arguments based on the State Tort Liability Act, under which "[t]he State . . . waives its immunity for liability for the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances." Hawaii Revised Statutes (HRS) § 662-2 (2016). We therefore do not address whether a private individual could be held liable for negligence in setting the custody status of a pretrial detainee.

[32]   All of the circuit court's findings, "[u]nless otherwise indicated, . . . have been proven to be probably more true than not true."

immunity to suits seeking monetary damages for constitutional violations, <u>Figueroa v. State</u>, 61 Haw. 369, 383, 604 P.2d 1198, 1206-07 (1979), we address Gordon's state law due process claim because of the importance of the constitutional issue at stake and to provide guidance pursuant to our supervisory powers under Hawaii Revised Statutes § 602-4 (2016).[33]

Like the Fourteenth Amendment of the United States Constitution, Article I, Section 5 of the Hawai'i State Constitution guarantees all persons a right to be free from punishment prior to an adjudication of guilt in accordance with due process of law.  <u>Compare</u> Haw. Const. art. I, § 5 ("No person shall be deprived of life, liberty or property without due process of law[.]") <u>with</u> U.S. Const. amend. XIV, § 1 (providing that no state shall "deprive any person of life, liberty, or property, without due process of law[.]").

We hereby adopt the <u>Bell</u> standard for determining whether an Article I, Section 5 due process violation has occurred under the circumstances of this case.  Thus, a court may infer that a condition or set of restrictions amounts to punishment of a pretrial detainee when:  (1) there is "a showing of an expressed

---

[33]  Section 602-4 of the Hawaii Revised Statutes provides:

> **Superintendence of inferior courts.**  The supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law.

intent to punish on the part of detention facility officials;"
(2) the condition or restriction is not "reasonably related to a
legitimate goal;" or (3) the condition or restriction is
"excessive in relation to the alternative purpose assigned to
it." 441 U.S. at 538-39. We note that under our constitution,
however, pretrial detainees may be guaranteed greater due
process protection than convicted prisoners. Accord State v.
Bayaoa, 66 Haw. 21, 25 n.2, 656 P.2d 1330, 1333 n.2 (1982)
(agreeing with the dissenting Bell justices that, at least in
the context of Fourth Amendment searches, "the rights of persons
not yet convicted of crimes must be more closely scrutinized
than the rights of prisoners.") (citing Bell, 441 U.S. at 568
(Marshall, J., dissenting); 441 U.S. at 579 (Stevens, J.,
dissenting)).

We also note that model practices acknowledge solitary
confinement as a legitimate administrative and penological tool,
but reserve its use for particularized and serious problems.
For example, the American Bar Association's ("ABA") Criminal
Justice Standards on the Treatment of Prisoners ("ABA
Standards") generally advise using solitary confinement or
"segregated housing" sparingly or not at all, except to manage
specific concerns.[34] ABA, ABA Criminal Justice Standards:

---

[34] "Segregated housing" is defined as "housing of a prisoner in conditions
characterized by substantial isolation from other prisoners, whether pursuant
(continued. . .)

<u>Treatment of Prisoners</u>, Standard 23-2.7(a) (3d ed. 2011).  Long-term segregated housing —- segregation that "is expected to extend or does extend for a period of time exceeding 30 days" —- may be used to impose discipline for a "very severe disciplinary infraction, in which safety or security was seriously threatened," to curtail "a credible continuing and serious threat to the security of others or to the prisoner's own safety," or to prevent the spread of "airborne contagion."  <u>Id.</u>, Standards 23-1.0(o), 23-2.7(a)(i-iii).  Further, the ABA Standards advise that prisoners should not be placed in long-term segregated housing based on a security risk posed by the prisoner unless:

> [L]ess restrictive alternatives are unsuitable in light of a <u>continuing and serious threat</u> to the security of the facility, staff, other prisoners, or the public as a result of the prisoner's:
>> (i)  history of <u>serious violent behavior in correctional facilities</u>;
>> (ii) acts such as <u>escapes or attempted escapes</u> from secure correctional settings;
>> (iii) <u>acts or threats of violence likely to destabilize the institutional environment to such a degree that the order and security of the facility is threatened</u>;
>> (iv)  <u>membership in a security threat group</u> accompanied by a finding based on <u>specific and reliable information</u> that the prisoner either has engaged in dangerous or threatening behavior directed by the group or directs the dangerous or threatening behavior of others; or
>> (v)  <u>incitement or threats to incite group disturbances</u> in a correctional facility.

<u>Id.</u>, Standard 23-2.7(b) (emphases added).

---

(. . . continued)
to disciplinary, administrative, or classification action."  <u>ABA Standards</u>, Standard 23-1.0(r).

Federal prison policy is in accord with the ABA Standards. The Bureau of Prisons ("BOP") requires pretrial detainees to be held in the least restrictive conditions consistent with their security needs.  BOP Program Statement 7331.04 on Pretrial Inmates, § 6 (January 31, 2003).  Pretrial detainees may be held in a "special housing unit" ("SHU"), which amounts to solitary confinement, but such confinement must always serve a specific penological purpose, and an inmate's status must be reviewed within three work days of placement in the SHU, again at seven calendar days, and then every thirty days after that.  BOP Program Statement 5270.11 on Special Housing Units, § 1(a), 7 (Nov. 23, 2016).

The issue of whether current DPS solitary confinement policies and procedures comports with state due process standards is not before us.[35]  In this case, however, for the reasons explained in Part IV, Section A, subsections 2, 3, and 4, Gordon's placement in solitary confinement was not reasonably related, and was excessive in relation to, any legitimate government purpose.  Therefore, Gordon's due process right under Article I, Section 5 of the Constitution of the State of Hawaiʻi

---

[35]  We must express our serious concern, however, with the DPS policy referenced in this case that only required the custody status of a maximum custody inmate, whether pretrial detainee or sentenced prisoner, to be reassessed once a year.  It appears this annual review policy would not pass constitutional muster; as noted, even federal prisons require thirty day reviews.

was also violated.

Because the State has not waived its sovereign immunity for damages claims against the State for state constitutional violations, however, there is no damages remedy for the state constitutional due process violation. Additionally, the only possible "further and additional relief" for this violation, as requested by Gordon in his Amended Complaint, would have been injunctive or declaratory in nature. At the time of trial in this case, Gordon was already being held in medium custody, thus injunctive relief would have been unnecessary. To provide future guidance, however, we note that Gordon's due process rights under Article I, Section 5 of the Hawaiʻi Constitution were violated.[36]

## V. Conclusion

We conclude that Gordon was subjected to unlawful pretrial punishment when he was detained in solitary confinement for over nine months. His treatment was a violation of his rights under

---

[36] In Bell, pretrial detainees sought immediate relief from their conditions of confinement and brought their claim by petition for writ of habeas corpus, which the court declined to comment upon. 441 U.S. at 526 n.6 ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement[.]").

In our jurisdiction, the writ of habeas corpus is still available in the pre-conviction context. See HRS § 660-3 (2016) ("The supreme court . . . and the circuit courts may issue writs of habeas corpus in cases in which persons are unlawfully restrained of their liberty[.]"); see also Oili v. Chang, 57 Haw. 411, 412, 557 P.2d 787, 788 (1976) (noting that habeas petitions that would require an evidentiary hearing must be filed in the circuit court). The writ has, however, been abolished in the post-conviction context. See Hawaiʻi Rules of Penal Procedure Rule 40(a) (2006) (creating a post-conviction proceeding that encompasses and supersedes "all common law and statutory procedures for the same purpose, including habeas corpus").

the due process clauses of the Fourteenth Amendment of the United States Constitution and Article I, Section 5 of the Hawai'i State Constitution.  We therefore overrule the ICA's memorandum opinion to that extent.  However, we conclude that Cho was entitled to qualified immunity under federal and state qualified immunity principles for her part in Gordon's confinement.  Accordingly, the ICA's July 6, 2017 judgment on appeal, filed pursuant to its May 30, 2017 memorandum opinion, is affirmed on other grounds.

| | |
|---|---|
| Eric A. Seitz<br>(Della A. Belatti,<br>Bronson Avila, and<br>Sarah R. Devine with<br>him on the briefs)<br>for petitioner | /s/ Mark E. Recktenwald<br><br>/s/ Paula A. Nakayama<br><br>/s/ Sabrina S. McKenna<br><br>/s/ Richard W. Pollack |
| Kendall J. Moser<br>(Russell A. Suzuki and<br>Caron M. Inagaki with<br>him on the briefs)<br>for respondents | |

